# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| SCHILLINGER GENETICS, INC., an Iowa corporation, and JOHN SCHILLINGER, on his own behalf and in his capacity as Owners' Representative, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0260-MTZ |
| BENSON HILL SEEDS, INC., *f/k/a* SGI GENETICS, INC., a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: October 5, 2020
Date Decided: February 1, 2021

Michael P. Kelly, Andrew S. Dupre, and Sarah E. Delia, McCARTER & ENGLISH, LLP, Wilmington, Delaware, *Attorneys for Plaintiffs.*

Travis S. Hunter and Dorronda R. Bordley, RICHARDS, LAYTON & FINGER, P.A, Wilmington, Delaware; Kenneth J. Mallin, Jason S. Meyer, and Sasha D. Riedisser, BRYAN CAVE LEIGHTON PAISNER, LLP, St. Louis, Missouri, *Attorneys for Defendant*.

**ZURN, Vice Chancellor.**

Parties contracting in good faith and with prudent foresight often place funds in escrow to tailor their contractual obligations to events, predicted or unexpected, that may come to pass. In the present case, the buyer purchased substantially all of the seller's assets pursuant to an asset purchase agreement, and escrowed funds to secure the seller's obligations with respect to any post-closing price adjustment or indemnity claims in two distinct accounts, each guarded by some procedural hurdles that the buyer struggled to clear.

The first account contained escrow funds to be distributed in accordance with the agreement's post-closing purchase price adjustment process. Under that process, the buyer was obligated to deliver to the seller a closing statement setting forth the buyer's calculated purchase price adjustment within ninety days of closing. The buyer failed to timely deliver the requisite closing statement. After much prodding by the seller, the buyer submitted the closing statement nearly two months late.

The second escrow account contained funds to be distributed in satisfaction of any timely indemnity claim for the seller's breach of the agreement. The agreement set forth a period and procedure for the buyer to give notice of such indemnity claims and preserve the buyer's right to claw back the indemnity escrow funds. The agreement also specified how notice was to be given, while providing that the buyer's failure to properly notice an indemnity claim would not adversely affect the buyer's right to the indemnity escrow funds in the absence of material

1

prejudice. The buyer's written notice of an escrow claim pressed the boundaries of the agreement's time and manner requirements.

The seller, as plaintiff in this action, claims the buyer breached the agreement by failing to follow the procedures for properly claiming the escrowed funds and by ultimately refusing to release those funds. The seller moved for partial summary judgment. Because the buyer failed to timely deliver the closing statement as required by the agreement, I conclude the seller is entitled to summary judgment on its claim for the adjustment escrow funds. But because the buyer preserved its indemnity claim by providing sufficient notice, I conclude summary judgment is appropriate in the buyer's favor on the seller's count regarding the indemnity escrow funds.

## I.    BACKGROUND[1]

Schillinger Genetics, Inc. ("Seller" or the "Company") is an Iowa corporation that was formerly engaged in the business of soybean research and breeding.[2] Plaintiff John Schillinger ("Schillinger," and together with Seller, "Plaintiffs")

---

[1] Citations in the form of "Compl. ¶ —" refer to the plaintiff's complaint, available at Docket Item ("D.I.") 1. Citations in the form of "Answer ¶ —" refer to the Defendant's answer to the Complaint; citations in the form of "Affirmative Defense ¶ —" refer to Defendant's affirmative defenses to the Complaint; and citations in the form "Countercl. ¶ —" refer to Defendant's counterclaims; each is available at D.I. 44.

[2] Answer ¶ 7.

founded Seller.[3]  Benson Hill Seeds, Inc. ("Defendant" or "Buyer") is a Delaware corporation and "crop improvement company dedicated to unlocking the natural diversity of plants."[4]  Buyer conducts soybean research and breeding using assets purchased from Seller.[5]

### A.    The Parties Execute The APA And Escrow Agreement.

This action arises out of an asset purchase agreement dated February 7, 2019 (the "Closing")[6] between and among Seller or certain stockholders of Seller (the "Owners"), Schillinger as "Owners' Representative," and Buyer (the "APA").[7]  The APA transferred all assets and certain liabilities of Seller to Buyer for $14,000,000 subject to certain adjustments (the "Transaction").[8]  The APA contemplates a post-Closing purchase price adjustment and sets forth a process for calculating and paying any adjustment out of escrowed funds.  It also contains indemnification provisions

---

[3] *Id.* ¶ 8.

[4] D.I. 24 at 2; D.I. 24, Affidavit of Michael Wainscott ¶ 3 [hereinafter "Wainscott Aff."]. Buyer is formerly known as "SGI Genetics, Inc." and is a wholly owned subsidiary of Benson Hill Biosystems.  *See* Wainscott Aff. ¶ 3.

[5] Answer ¶ 9.

[6] I use this term to refer to both the closing of the Transaction and the date on which it occurred, February 7, 2019.

[7] Compl. Ex. A [hereinafter "APA"].

[8] *Id.* Recital A, §§ 2.1, 2.2, 2.3; *see also* Answer ¶ 15; D.I. 18, Affidavit of John Schillinger ¶ 2 [hereinafter "Schillinger Aff."].

pursuant to which Seller agreed to indemnify Buyer for breaches of certain provisions of the APA, also out of escrowed funds.

The parties also executed an escrow agreement dated February 7, 2019 (the "Escrow Agreement").[9] Buyer deposited $950,000 into an escrow account (the "Escrow Funds").[10] The Escrow Funds are divided into two separate accounts: "(a) $250,000 (such amount, together with any interest, future deposits, and other income thereon, the "Adjustment Escrow Funds"), and (b) $700,000 (such amount, together with any interest, future deposits, and other income thereon, the "Indemnity Escrow Funds")."[11] The Adjustment Escrow Funds are intended to secure the parties' post-Closing price adjustment obligations under Section 2.5 of the APA, and the Indemnity Escrow Funds are intended to secure the parties' indemnification obligations under Sections 7.1, 7.2, 7.3, and 7.5 of the APA.[12] Accordingly, the Adjustment Escrow Funds and Indemnity Escrow Funds are held in separate accounts and have distinct release and timing mandates under the APA and Escrow Agreement.[13]

---

[9] Compl. Ex. B [hereinafter "Escrow Agreement"]; Answer ¶ 17.

[10] Answer ¶ 19.

[11] Escrow Agreement § 3; *see also* APA § 2.8(a); Answer ¶ 20.

[12] *See* Answer ¶ 16.

[13] *See* APA § 2.8(a)–(c).

## 1. Post-Closing Price Adjustment

Section 2.5 of the APA sets forth a purchase price adjustment process.[14] That section obliges the Owners' Representative to prepare and deliver to Buyer a pre-Closing "Estimated Closing Statement" setting forth a reasonable good faith estimate of Seller's accounts payable.[15] After Closing, Buyer bears the burden of establishing a post-Closing adjustment to the purchase price if the Seller's actual accounts payable assumed and paid by Buyer exceeded the pre-Closing estimate:[16]

> Within ninety (90) calendar days after the Closing, Buyer shall prepare and deliver to Owners' Representative a calculation of the Accounts Payable of the Company and the Subsidiaries as of the Calculation Time (the "Closing Accounts Payable") and a calculation of the amount, if any, by which the Closing Accounts Payable exceeds the Target Accounts Payable (taking into account the adjustment to Accounts Payable made pursuant to Section 2.5(a)) (the "Closing Statement"). The Closing Statement shall be prepared in accordance with the Accounting Principles and the terms of this Agreement. After delivery of the Closing Statement, Buyer shall permit Owners' Representative and its accountants reasonable access to the accounting records, work papers, and computations used by Buyer in the preparation of the Closing Statement.[17]

The APA does not specify what should happen if Buyer fails to timely deliver a Closing Statement.[18]

---

[14] *See id.* § 2.5.

[15] *Id.* § 2.5(a).

[16] *Id.* § 2.5(b).

[17] *Id.*

[18] *See id.* § 2.5(b)–(c).

Within twenty days of receipt of the Closing Statement, Owners' Representative may notify Buyer in writing (a "Notice of Dispute") of any "Disagreement" regarding the Closing Statement.[19] If Owners' Representative fails to timely deliver a Notice of Dispute to Buyer, then Owners' Representative is deemed to have accepted the Closing Statement, and the Closing Statement is final, binding, and non-appealable.[20] If Owners' Representative does timely deliver a Notice of Dispute, then the APA sets forth a process for resolving the Disagreement: first by the parties' good faith negotiation and resolution efforts, but if those efforts are unsuccessful within twenty-five days after Buyer receives the Notice of Dispute, then by referral to an independent accounting firm.[21] If there is no Disagreement, or after any Disagreement is resolved under Section 2.5(c), the Estimated Closing Statement and Closing Statement are to be used to calculate and pay a "Final Adjustment Amount" under Sections 2.5(d), (e), (f), (g), and (h).[22]

Under those subsections, the APA's baseline outcome, in which Seller receives the Adjustment Escrow Funds as part of the Transaction consideration, may change depending on whether the Final Adjustment Amount was less than or equal

---

[19] *Id.* § 2.5(c) (defining "Disagreement" as "any" disagreement with respect to the Closing Statement).

[20] *Id.*

[21] *Id.*

[22] *Id.* § 2.5(c), (d).

to $50,000; in excess of $50,000 and positive; or in excess of $50,000 and negative.[23] An negative amount in excess of $50,000 triggers Buyer's right to claw back all or some of the Adjustment Escrow Funds.[24] But if the Final Adjustment Amount is zero, less than $50,000, or in excess of $50,000 and positive, Seller receives the Adjustment Escrow Funds.[25] Adjustment Escrow Funds that are not "claimed" by Buyer as a Final Adjustment Amount are to be released to Seller.[26]

---

[23] *See id.* § 2.5(e) ("[I]f the numeric value of the Final Adjustment Amount (without taking into account whether such number is positive or negative) is less than or equal to fifty thousand dollars ($50,000.00), then no post-Closing adjustment pursuant to this Section 2.5 shall be made, the Final Adjustment Amount, shall be deemed to be zero, and Sections 2.5(f), 2.5(g) and 2.5(h) shall be of no further force and effect. In the event that the numeric value of the Final Adjustment Amount (without taking into account whether such number is positive or negative) is more than fifty thousand dollars ($50,000.00), then (and only then) the provisions of Sections 2.5(f), 2.5(g), and 2.5(h) shall apply."); *id.* § 2.5(f) ("[I]f the Final Adjustment Amount is a positive number, the Company shall be entitled to receive from Buyer an amount in cash equal to the Final Adjustment Amount, which amount shall be payable in accordance with Section 2.5(g) below. If the Final Adjustment Amount is a negative number, Buyer shall be entitled to receive from the Company an amount in cash equal to the absolute value of the Final Adjustment Amount.").

[24] *See id.* § 2.5(f), (h).

[25] *See id.* § 2.5(e), (f). If the Final Adjustment Amount is in excess of $50,000 and positive, Seller gets funds in addition to the Adjustment Escrow Funds. *See id.* § 2.5(f)–(h).

[26] *Id.* § 2.8(c) (governing release of unclaimed escrow funds "[w]ithin the later of ninety (90) days after the Closing Date and five (5) days after the determination of the Final Adjustment Amount"); *id.* § 2.5(h) (providing for release of the Adjustment Escrow Funds after determination of the Final Adjustment Amount); Escrow Agreement § 4 (providing that within five business days following the determination of the Final Adjustment Amount, Buyer and Owners' Representative shall instruct the Escrow Agent to pay the amount, "if any, of the Adjustment Escrow Fund to be paid to Buyer pursuant to Section 2.5" of the APA, and that "[i]f there is no amount to be paid to Buyer under Section 2.5 of the [APA], then . . . the entire balance of the Adjustment Escrow Fund will be disbursed by the Escrow Agent to the Company").

## 2. Indemnification For Breaches Of Certain Representations, Warranties, And Covenants Under The APA

Plaintiffs promised to ensure the Company's Business was protected for Buyer's benefit and made numerous representations, warranties, and covenants regarding that Business.[27] Relevant here, Plaintiffs covenanted that Seller and Owners' Representative would refrain from competing with the Business, soliciting its suppliers and customers, and disclosing its confidential information.[28]

Under Section 7.2 of the APA, Seller agreed to indemnify Buyer for "Losses" "incurred or to be incurred by any of them resulting from or arising out of or in connection with" a breach of the representations, warranties, covenants or "other obligations" of Seller or any Owner in the APA, any "Related Agreement, or any other document delivered pursuant [to the APA] or in connection with the Closing."[29] The Escrow Agreement is the only "Related Agreement" under the APA, and is explicitly identified as a document delivered in connection with Closing

---

[27] *See, e.g.*, APA §§ 3.1–3.36, 5.3, 5.6, 5.7. Under the APA, "'Business' means the business activities, operations, and practices of the Company . . . as conducted by the Company . . . on the date hereof." *Id.* § 1.19.

[28] *See id.* §§ 5.6, 5.7. The parties stipulated that breaches of the non-compete and non-solicitation covenants in Section 5.7 would constitute irreparable harm. *Id.* § 5.8(b).

[29] *Id.* § 7.2(a)–(b). "Losses" include "any and all claims, losses, monetary damages, obligations, liabilities, fines, fees, penalties, expenses, or costs, plus reasonable attorneys' and professional fees and expenses, court costs, and expert witness fees and expenses, incurred in connection therewith and/or in connection with the enforcement of" the APA. *Id.* § 7.2.

8

under Section 2.4.[30] Owner's Representative also agreed to indemnify Buyer Losses incurred from or in connection with breaches of his representations, warranties, covenants, and obligations under the APA.[31]

Section 7.1's survival provision puts different limits on Buyer's recourse for different classes of representations.[32] Representations that are not "Fundamental Representations" (the "Non-Fundamental Representations") are subject to a one-year survival period; they expire twelve months after the Closing Date, "except that such expiration shall have no effect on any obligations in respect of which a notice of claim has been submitted hereunder prior to such expiration."[33] Plaintiffs' non-compete, non-solicitation, and non-disclosure covenants, as well as the representations and warranties in dispute between the parties, are Non-Fundamental Representations.[34]

Section 7.5 of the APA and Section 5 of the Escrow Agreement set forth the process for Buyer to notice and preserve indemnity claims (each an "Indemnity Claim") for breaches subject to indemnification, for the parties to resolve disputes

---

[30] *See id.* §§ 1.121, 2.4(a)(vii), 2.4(b)(iv); Answer ¶ 18.

[31] APA § 7.3(a)(b).

[32] *Id.* § 7.1.

[33] *Id.*

[34] *Id.* (characterizing a select few representations, warranties, and obligations, under the APA "Fundamental," and rendering all others non-Fundamental).

as to such claims, and for disbursement of the Indemnity Escrow Funds.[35] Both agreements require Buyer to provide Seller and Owners' Representative with written notice of an Indemnity Claim via a "Claim Notice."[36] The APA offers four means of giving a Claim Notice: (1) in person; (2) by confirmed facsimile; (3) by overnight courier, in which case notice is effective the next Business Day; and (4) by registered or certified mail, in which case notice is effective on the second succeeding Business Day.[37] The Escrow Agreement mirrors these methods, and additionally permits notice to be duly given via email.[38] Both agreements specify where notice thereunder must be given to Seller, including a particular mailing address and email address at "schillgen.com" for Schillinger; but they also permit delivery "at such other address for a Party as shall be specified by like notice."[39]

---

[35] *See id.* § 7.5; Escrow Agreement § 5.

[36] APA § 7.5 (stating that if Buyer seeks indemnification it "shall give reasonably prompt written notice to the indemnifying Party . . . specifying the facts constituting the basis for such claim and the amount, to the extent known, of the claim asserted"); *id.* § 8.1 (mandating that all notices under the APA be in writing); Escrow Agreement § 5(a) ("If Buyer is permitted to and elects to assert an Indemnity Claim, it shall give written notice of such claim (a 'Claim Notice') . . . ."); *id.* § 16 (mandating that all notices under the Escrow Agreement be in writing).

[37] APA § 8.1(a)–(d).

[38] Escrow Agreement § 16(i)–(iii).

[39] APA § 8.1; *accord* Escrow Agreement § 16 (stating that notice thereunder shall be "addressed at the address shown in this Section 16, or, as applicable, using such other address, facsimile number or e-mail address as may be designated in writing hereafter by such party").

Both agreements provide deadlines for submitting a Claim Notice. Under Section 7.5(a) of the APA, Buyer

> shall give reasonably prompt written notice to the indemnifying Party . . . specifying the facts constituting the basis for such claim and the amount, to the extent known, of the claim asserted; *provided*, that the right of a Person to be indemnified hereunder shall not be adversely affected by a failure to give such notice unless, and then only to the extent that, an Indemnifying Party is actually and materially prejudiced thereby.[40]

Under the Escrow Agreement, Buyer was required to submit a Claim Notice of any permitted Indemnity Claim "prior to the expiration of the Escrow Period" by February 10, 2020.[41]

Seller's receipt of a Claim Notice kicks off a dispute resolution process. Within ten business days of receipt, Seller may dispute the validity or amount of the claim (an "Indemnity Notice of Dispute").[42] Thereafter, the parties must consult and try to resolve their dispute; after thirty days, the Buyer may file suit.[43]

---

[40] APA § 7.5(a).

[41] Escrow Agreement § 5(a) (requiring Buyer to "give written notice of such claim to the Escrow Agent and to the [Owners'] Representative promptly following its obtaining knowledge of such Losses (*and in any event prior to the expiration of the Escrow Period*)" (emphasis added)). The Escrow Period began at Closing and "end[ed] one (1) Business Day following the one-year anniversary" of same. *Id.* § 1. The Escrow Agreement defines "Business Day" as "any day other than a Saturday, Sunday or federal holiday, or a day on which commercial banks in the State of Missouri are authorized to close." *Id.* The one-year anniversary of Closing fell on Friday, February 7, 2020. The next Business Day was Monday, February 10.

[42] APA § 7.5(d).

[43] *Id.*

If indemnification is ultimately owed, then "Owners' Representative shall cause the Escrow Agent to pay such amount not more than thirty (30) days after any Buyer Indemnified Person provides notice to Owners' Representative of such amount."[44] Indemnity Escrow Funds not claimed via a Claim Notice are to be promptly disbursed after the Escrow Period expires.[45]

## B. The Parties' Relationship Sours Post-Closing.

Pursuant to the APA, Buyer agreed to hire Schillinger as Chief Technology Officer.[46] At Closing, Schillinger accepted Buyer's employment offer, and he continued to work for Buyer pursuant to an employment agreement dated February 7, 2019 (the "Employment Agreement").[47] The Employment Agreement included various non-competition and restrictive covenants.[48] The parties did not identify the

---

[44] *Id.* § 7.5(c).

[45] Escrow Agreement § 5(d) ("Upon the expiration of the Escrow Period, the Escrow Agent shall disburse to the Company, as promptly as practicable, any portion of the Indemnity Escrow Fund not subject to a Claim Notice as provided in this Section 5."); APA § 2.8(c) (stating that Indemnity Escrow Funds not subject to claim were to be released "[p]romptly following the first anniversary of the Closing Date"); *id.* § 7.5(a) (stating that "[s]ubject to the terms of this Agreement and of the Escrow Agreement (except to the extent that the Indemnifying Party disputes the indemnification obligations associated with such claim), the Indemnifying Party shall pay, or, if applicable, shall cause the Escrow Agent to pay, the amount of any valid claim not more than thirty (30) days after the Indemnified Party provides notice to the Indemnifying Party of such amount").

[46] *See* APA § 5.11(a) & Sched. 5.11; *see also* Answer ¶ 21.

[47] *See* Answer ¶¶ 21, 22; Schillinger Aff. ¶ 3; D.I. 12, Ex. 2 [hereinafter "Employment Agreement"].

[48] *See, e.g.*, Employment Agreement §§ 2.5, 2.6.

Employment Agreement as a "Related Agreement" under the APA or as a document to be delivered in connection with Closing under Section 2.4.[49]

Shortly after signing the Employment Agreement, Schillinger allegedly hatched plans to compete with the Business; began soliciting its customers and disclosing his competitive plan in the process; began taking other actions in furtherance of his plan; and began sharing Buyer's confidential and proprietary information.[50]  Buyer learned of Schillinger's actions, and believed they breached the Employment Agreement and the APA.[51]  As a result, on April 12, Buyer terminated Schillinger's employment and his access to his schillgen.com e-mail account.[52]  This spurred Schillinger to file an arbitration action against Buyer, which is currently pending in Iowa and scheduled for a final hearing in spring of 2021 (the "Arbitration").[53]

---

[49] *See* APA §§ 1.121, 2.4.  Section 2.4 does, however, require to Seller to deliver at Closing "such other documents, instruments and agreements, including notarial and other deeds, as may be required by local Law and custom, or reasonably requested by Buyer, for the purpose of consummating the transactions contemplated by this Agreement." *Id.* § 2.4(a)(xxii).  Buyer faces no similar Closing document delivery obligation under Section 2.4(b).

[50] *See* Wainscott Aff. ¶¶ 7, 9, 10, 11, 12, 20 & Exs. 2–5.

[51] *See* D.I. 24 at 11–14 (summarizing Schillinger's alleged breaches of the Employment Agreement and APA § 5.6); *see also* Wainscott Aff. Ex. 3.

[52] Answer ¶ 22; Schillinger Aff. ¶ 4; Wainscott Aff. ¶ 13.

[53] Answer ¶ 23; Wainscott Aff. ¶¶ 19, 20; D.I. 12, Ex. 3.  On April 23, Buyer filed for injunctive relief in Iowa state court to compel Schillinger to turn over his electronic devices in aid of Buyer's investigating his misconduct.  *See* D.I. 24, Affidavit of Kenneth J. Mallin [hereinafter "Mallin Aff."] Ex. 12.  Schillinger counterclaimed on the basis that his termination was wrongful under the Employment Agreement.  *Id.* Ex. 13.  The Iowa court

13

In addition to the fallout under Schillinger's Employment Agreement, the parties' relationship further soured when Buyer discovered that Plaintiffs engaged in pre- and post-Closing conduct that allegedly breached certain APA Non-Fundamental Representations. For example, Buyer learned that Seller failed to disclose Material Contracts and their attendant obligations, as well as encumbrances on certain Accounts Receivable, and that Seller potentially misrepresented that it had not been violating or infringing any intellectual property by conducting the Business.[54]

## C. Buyer Issues An Untimely Closing Statement.

The parties' fractured relationship also manifested in their post-Closing settling up. The APA obligated Buyer to deliver to Schillinger, as Owners' Representative, a Closing Statement and to give Schillinger reasonable access to the records used in preparing it.[55] Because Closing occurred on February 9, Buyer was required to deliver a Closing Statement by May 8, 2019. Buyer failed to do so.[56]

---

held that Schillinger's claims were governed by a mandatory arbitration provision, and stayed that action pending an arbitration. *Id.* Ex. 14. Schillinger pursued the Arbitration, and Buyer counterclaimed in that proceeding. *See* Wainscott Aff. ¶¶ 19–20 & Ex. 8.

[54] *See, e.g.*, Wainscott Aff. ¶¶ 21–27.

[55] *See* APA § 2.5; Answer ¶¶ 25, 26.

[56] Answer ¶¶ 27, 28.

In view of Buyer's failure, Seller contacted Buyer via counsel three times.[57] On May 9, Seller's counsel notified Buyer's counsel that the deadline to submit the Closing Statement had lapsed.[58] Buyer's counsel did not dispute that the deadline lapsed, but indicated that that they had followed up with their client and were awaiting a response.[59] On May 20 and 29, Seller again apprised Buyer it had still not submitted a Closing Statement, and that Seller expected to receive one.[60] In Seller's May 29 communication, its counsel acknowledged the Arbitration and expressly noted Seller's "preference not to expand the disputes between the parties," but also made clear that "the continued delays may leave [Schillinger] and the company with no choice if [Buyer] continues to fail to satisfy its obligation to deliver the required report."[61]

---

[57] Compl. Exs. C, D, E; Answer ¶ 29.

[58] *See* Compl. Ex. C at 1 ("Yesterday was the deadline (pursuant to section 2.5(b) of the Purchase Agreement) for Benson Hill to deliver to John Schillinger a statement of the Closing Accounts Payable and the amount, if any, by which the Closing Accounts Payable differed from the Target Accounts Payable. Do you know (or can you check on) the status of this report?").

[59] *See id.* ("We followed up with our client on this yesterday and are awaiting their response. We'll continue to follow up to get this wrapped up.").

[60] *See* Compl. Ex. D at 1 ("Just following up on the AP report that was due on May 8. Do you have any more information on its status and timing?"); *id.* ("We confirmed with our client that they have a draft and it is just about complete. They are meeting internally with the finance team finalize. I would expect it in the next few days, but we'll keep you posted."); Compl. Ex. E at 1 (communicating on May 29 that the Closing Statement deadline had passed).

[61] Compl. Ex. E at 1 ("The statement of the Closing Accounts Payable and the amount, if any, by which the Closing Accounts Payable differed from the Target Accounts Payable is now three weeks past its due date under the Asset Purchase Agreement. Given the limited

Approximately one month passed, and Buyer still failed to satisfy its obligation under Section 2.5. Seller's counsel sent Buyer's counsel a letter on June 24 (the "June 24 Letter").[62] The June 24 Letter stated,

> Pursuant to Section 2.5(b) of the Asset Purchase Agreement, the report referred to above was required to be delivered to Mr. Schillinger, as the "Owner's Representative" of the Company, on or before May 8, 2019. SGI Genetics, Inc. [Buyer] has failed and refused to deliver this report in accordance with the terms of the Asset Purchase Agreement. I have contacted your external law firm (Bryan Cave Leighton Paisner LLP) on three separate occasions in an attempt to ascertain the status and timing of the delivery of this report. I have been told that it "was just about complete", that it is being reviewed and that it was to be expected "in the next few days". The report is now more than six weeks past due, and SGI Genetics, Inc. [Buyer] continues to fail and refuse to provide the report and permit the inspections envisioned and required by section 2.5(b) of the Asset Purchase Agreement. On behalf of [Seller] and John Schillinger, as the Owner's Representative, *you are hereby notified that SGI Genetics, Inc. [Buyer] is in default of, has breached and continues to breach and be in default of the Asset Purchase Agreement.*[63]

---

scope of the report and the relatively small number of accounts payable that it likely covers, it is difficult to understand the cause of the delay. I know that John Schillinger and SGI Genetics are already involved in a dispute, and it is our preference not to expand the disputes between the parties. However, the continued delays may leave John and the company with no choice if BHB continues to fail to satisfy its obligation to deliver the required report. Please let me know when we can expect the report."); *id.* ("We've passed this request along to our client and will pass along their reply as soon as we have it.").

[62] Compl. Ex. F; Answer ¶ 29.

[63] Compl. Ex. F at 2 (emphasis added) (noting Seller's belief that Buyer's breaches were "intentional and willful").

As with the May 29 communication, Seller recognized the Arbitration and "prefer[ence] to avoid a continuing and protracted dispute with [Buyer]."[64] Accordingly, the June 24 Letter warned,

> If SGI Genetics, Inc. [Buyer] does not provide the report and other information required by section 2.5(b) on or before July 5, 2019, the Company and Mr. Schillinger will be forced to take such steps as may be necessary and appropriate to protect its and their interests, including but not limited to filing suit to obtain injunctive relief and damages resulting from defaults of SGI Genetics, Inc. under the Asset Purchase Agreement . . . .[65]

Nearly two months after the deadline passed, on July 3, Buyer emailed Seller a purported Closing Statement and Closing Accounts Payable, and informed Seller that "[t]he calculations reflect a negative adjustment of $80,219.04."[66] On a July 9 telephone conference, Seller's counsel acknowledged that the July 3 email, rather than a "formal notice letter," was an acceptable delivery.[67] The parties continued to communicate regarding the Closing Statement.[68]

---

[64] *Id.*

[65] *Id.*

[66] Compl. Ex. H at 4; Answer ¶ 30.

[67] Compl. Ex. H at 4 ("On behalf of Benson Hill Biosystems, please find attached the Closing Statement with calculation of Closing Accounts Payable, which we are delivering pursuant to 2.5(b) of the Asset Purchase Agreement. . . . In the interest of getting this to you and John as quickly as possible, we are sending to you via email without a formal notice letter. We would appreciate your confirmation of receipt and that this manner of delivery is acceptable to you and John."); *id.* ("Thank you for your call and for confirming that delivery by email is acceptable. Per your request, we will send a hard copy of the spreadsheet to John S. by FedEx. I expect it will go out tomorrow.").

[68] *See generally id.*

On July 15, Buyer delivered revised versions of those documents.[69] Buyer purported to claim a purchase price adjustment for a $49,292.53 line item labeled "Seth Taylor Bad Debt" (the "Bad Debt").[70] To understand Buyer's purported adjustment, Seller repeatedly requested that Buyer give Seller and Schillinger reasonable access to its accounting work papers, records, and computations used to prepare the late Closing Statement, pursuant to Section 2.5(b) of the APA.[71] In response, Buyer provided certain records and computations.[72]

Via letter dated July 31, Schillinger issued a Notice of Dispute.[73] Seller's counsel informed Buyer of its Disagreements with respect to the Closing Statement, including Buyer's untimely submission in violation of the APA;[74] Seller's belief that Buyer had not allowed access to all "the accounting records, work papers, and computations used by Buyer in relation to the proposed adjustment for" the Bad

---

[69] Answer ¶ 31.

[70] *Id.*

[71] *Id.* ¶ 33.

[72] *Id.* ¶ 34.

[73] *Id.* ¶ 32; Compl. Ex. G (stating that "[t]his letter shall serve as the Notice of Dispute of the Owner[s'] Representative, on his behalf and on behalf of the Company, of its and their Disagreement with the proposed and revised Closing Statement and Closing Accounts Payable").

[74] Compl. Ex. G at 2 (identifying as a "Disagreement" that "Buyer failed and refused to deliver its proposed Closing Statement and Closing Accounts Payable until July 3, 2019 in clear violation of and default of the Asset Purchase Agreement").

Debt;[75] and Seller's belief that the Bad Debt concerned an Account Receivable, rather than an Account Payable that would affect any post-Closing adjustment under Section 2.5.[76] Seller's Notice of Dispute reiterated that "Owners' Representative and the Company stand ready and willing to negotiate in good faith to resolve any Disagreement which remains," and reminded Buyer that, under the APA, failure to resolve any Disagreement required the parties to submit their disputes to an independent accountant.[77]

In an attempt to resolve the Disagreements in good faith, as required by the APA, Seller requested access to the supporting papers, but Buyer provided no further documents.[78] Given that the APA's allotted twenty-five day period to resolve Disagreements had ended, Seller emailed Buyer on September 6 and October 8, requesting to submit the Disagreement to an independent accountant for final resolution under Section 2.5(c).[79] Seller noted that Buyer's continued avoidance and

---

[75] *Id.*

[76] *Id.* at 2–3.

[77] *Id.* at 4.

[78] *See* Answer ¶¶ 33, 34.

[79] *Id.* ¶ 38; Compl. Ex. H at 1 ("The 25 day negotiation period has ended, and we presumably aren't going to reach an agreement (since [Buyer] didn't even respond to our objections). The agreement envisions the appointment of a neutral accountant to determine the correct adjustment, if any, and the corresponding distribution of funds from the escrow account. Given that [Buyer] has missed each of the deadlines associated with this adjustment, we would like to get/keep this process moving to a resolution."); Compl. Ex. I at 1 ("I have heard nothing from you since you for a month and a half, and the 25 day negotiation period has long since ended. [Buyer] has not responded to our objections, nor

frustration of Section 2.5's processes would result in court action.[80]  To date, Buyer has refused to resolve the Disagreement under Section 2.5 or execute a joint instruction releasing the $250,000 Adjustment Escrow Funds to Seller.[81]

### D.  Buyer Asserts An Indemnity Claim.

On February 7, 2020, Buyer sent Schillinger and his counsel a Claim Notice under Section 7.5 of the APA for Plaintiffs' alleged breaches of Non-Fundamental Representations.[82]  Buyer sent the Claim Notice, dated February 7, 2020, via Overnight Express to Schillinger at his specified mailing address under the APA and Escrow Agreement.[83]  Schillinger received it on February 10, three days after the Non-Fundamental Representations' survival period expired and on the final day of the Escrow Period.[84]  Buyer also sent the Claim Notice via email to Schillinger's

---

has it responded to our request to appoint a neutral accountant to resolve any accounting disputes and to direct the distribution of funds from the escrow account.").

[80] Compl. Ex. I at 1 ("We would prefer to avoid the need to file a lawsuit to compel [Buyer] to participate in the agreed upon process, but [Buyer]'s actions (or, more accurately, inactions) are effectively requiring us to do so.  Please let me know this week what [Buyer]'s position is with respect to our objections.  If we are unable to resolve this -- and appoint a neutral accountant in accordance with the terms of the agreement -- within the next two weeks, we will have no other choice than to seek a court order appointing a neutral accountant and proceeding with the format agreed upon in the purchase agreement.").

[81] Answer ¶¶ 40, 41.

[82] Compl. Ex. J at 1; Answer ¶¶ 50, 51.

[83] Answer ¶¶ 50, 51.

[84] *Id.* ¶ 50.  Also on February 7, Buyer sent the Claim Notice via e-mail and FedEx to the Escrow Agent, as required under the APA and Escrow Agreement; the Escrow Agent also received the FedEx package on February 10.  *See id.* ¶¶ 50, 51.

defunct schillgen.com email address; Schillinger did not receive that e-mail, and Buyer did not receive receipt of its delivery.[85] Schillinger had never updated his e-mail address from the one listed in the APA and Escrow Agreement.[86] Since Buyer's Claim Notice, the Escrow Agent has continued to hold the Indemnity Escrow Funds.[87]

Within ten days of receiving Buyer's Claim Notice, via letter on February 19, Seller issued its Indemnity Notice of Dispute, challenging Buyer's Indemnity Claim on the basis that notice was untimely and that its substantive allegations were false.[88] By letter dated March 5, Buyer responded and refuted Seller's position, but stated that Buyer would contact Seller's counsel to attempt to resolve the dispute in good faith, while also reserving the right to file suit in this Court.[89]

### E. This Action Ensues.

Plaintiffs filed this action on April 7, 2020, claiming Buyer has improperly refused to release the Escrow Funds to Seller.[90] Count I asserts a claim for breach

---

[85] *Id.* ¶¶ 53, 54; Schillinger Aff. ¶ 5.

[86] Wainscott Aff. ¶ 28.

[87] *See* Answer ¶¶ 51, 66.

[88] Compl. Ex. K at 2 ("We have received a letter from Kenneth J. Mallin, Esq., of Bryan Cave Leighton Paisner LLP, dated February 7, 2020 . . . , which purports to be a Dispute Notice pursuant to the Asset Purchase Agreement . . . . The Letter is untimely, it is insufficient, and it is both inaccurate and false and misleading . . . .").

[89] Compl. Ex. L at 3.

[90] *See generally* Compl.

of the APA and Escrow Agreement regarding the Indemnity Escrow Funds.[91] Count II asserts a claim for breach of the APA and Escrow Agreement regarding the Adjustment Escrow Funds.[92] Count III asserts trade libel.[93] Plaintiffs seek damages; specific performance of Buyer's obligations under the Escrow Agreement to execute a joint instruction to cause the Escrow Agent to release all remaining Escrow Funds; a declaration that Defendant has waived its right to a post-Closing adjustment by failing to pursue it in the manner required by APA Section 2.5; and costs and fees.[94]

On April 20, Buyer moved to dismiss or stay this action in view of the Arbitration ("Buyer's Motion"),[95] contending "any decision with regard to th[e Escrow Funds] revolves around factual claims and legal issues raised by Plaintiffs and [Defendant] in the First Filed Arbitration."[96] In response, on May 8, Plaintiffs moved for partial summary judgment on Counts I and II of the Complaint (the "Motion," and together with Buyer's Motion, the "Motions").[97] Buyer opposed the Motion and submitted an affidavit pursuant to Court of Chancery Rule 56(f).[98]

---

[91] *Id.* ¶¶ 69–76.

[92] *Id.* ¶¶ 77–82.

[93] *Id.* ¶¶ 83–86.

[94] *Id.* ¶¶ A–F.

[95] D.I. 7.

[96] D.I. 12 at 1.

[97] D.I. 13.

[98] *See* D.I. 24, Rule 56(f) Declaration of Travis S. Hunter, Esq. [hereinafter "Rule 56(f) Aff."]; *see also* Ct. Ch. R. 56(f).

Buyer contended summary judgment is inappropriate because it had yet to answer the Complaint or conduct discovery, and because discovery is necessary into any unclean hands defense, whether Plaintiffs received actual notice of Buyer's claim for indemnification, and damages.[99] The parties fully briefed the Motions as of July 31.[100]

On August 24, the Court denied Buyer's Motion and allowed Plaintiffs' claims to proceed, as Counts I and II arise out of the APA and Escrow Agreement and are subject to valid forum selection clauses in favor of Delaware courts.[101]

The Court heard argument on the Motion on August 25.[102] In order to better assess the Motion on summary judgment, the Court directed Buyer to answer the

---

[99] *See* Rule 56(f) Aff. ¶¶ 11–15.

[100] D.I. 13; D.I. 18; D.I. 24; D.I. 27.

[101] D.I. 37. However, I invited the parties to address at argument whether the Arbitration addresses a competing claim to the Indemnification Escrow Funds; whether, assuming Plaintiffs prevail in this action, the arbiter's ruling could warrant withholding or offsetting payout of those escrowed amounts; and whether the APA and Escrow Agreement permit such a delay. *Id.* The parties' presentations did not persuade the Court that this action and the Arbitration overlap such that the Arbitration bears on these proceedings. To the contrary, they are distinct, and it is not apparent that the parties will be able to stake any claim to the Escrow Funds in the Arbitration, which is siloed to the Employment Agreement. And to the extent Defendant attempts to loop in breach of the Employment Agreement as a basis for indemnification under Section 7.5 of the APA, that position fails. Under the APA, Plaintiffs agreed to indemnify Buyer for breaches of the APA, any Related Agreement, "or any other document delivered pursuant [to the APA] or in connection with the Closing." APA § 7.1. The APA does not identify the Employment Agreement as a Related Agreement, nor does it identify it as a document to be delivered in connection with Closing. *See id.* §§ 1.121, 2.4.

[102] D.I. 38; D.I. 41 [hereinafter "Hr'g Tr."].

23

Complaint and file any counterclaims and affirmative defenses, and afforded the parties to submit supplemental letter briefs regarding summary judgment.[103]

Accordingly, on September 16, Buyer filed its Answer, Affirmative Defenses, and Counterclaim.[104] Buyer asserted as an affirmative defense that "[t]he Complaint is barred, in whole or in part, by the doctrines of waiver, estoppel, laches, and/or unclean hands," pointing to Plaintiffs' alleged breaches of the APA.[105] Buyer also affirmatively asserted that "Plaintiffs waived the requirement that any Closing Statement be delivered on or before May 8, 2019" via the June 24 Letter;[106] that "Plaintiffs have suffered no prejudice as a result any delay in delivery of the Closing Statement";[107] and that to the extent the Court finds Buyer's Indemnity Claim untimely, "Plaintiffs have suffered no actual or material prejudice or other injury as a result thereof."[108] Buyer's Counterclaim asserted one count for breach of contract, alleging that Seller and Schillinger breached the APA by engaging in competitive

---

[103] *See* Hr'g Tr. at 49–50; *Kelly v. Blum*, 2010 WL 629850, at *6 (Del. Ch. Feb. 24, 2010) (stating that the Court "maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application").

[104] *See generally* D.I. 44.

[105] Affirmative Defense ¶ 2.

[106] *Id.* ¶ 3.

[107] *Id.* ¶ 4.

[108] *Id.* ¶ 9.

behavior, sharing confidential information, and failing to make disclosures required by the APA.[109]

After Plaintiffs and Buyer submitted their supplemental letter briefs, the Motion was taken under advisement on October 5.[110]

## II. ANALYSIS

Summary judgment may be granted if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[111] Under Delaware law, the "proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law," requiring the court to "make its own interpretation of the contractual language."[112] "When interpreting a contract, the role of a court is to effectuate the parties' intent."[113] "If a writing is plain and clear on its face, *i.e.,* its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[114]

---

[109] Countercl. ¶¶ 71–78.

[110] *See* D.I. 48; D.I. 50.

[111] Ct. Ch. R. 56(c).

[112] *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991) (quotation omitted).

[113] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[114] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

"Indeed, this Court has described 'pure[] matters of contractual interpretation' as 'readily amenable to summary judgment.'"[115]  However, summary judgment for a contract interpretation "is appropriate only if the contract in question is unambiguous."[116]  And "[s]ummary judgment will be denied when the legal question presented needs to be assessed in the more highly textured factual setting of a trial.  The Court also maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application."[117]  "Finally, the Court may award summary judgment in favor of a nonmoving party if it finds that the material facts are undisputed and that the nonmoving party is entitled to judgment as a matter of law."[118]

The parties agree that the APA and Escrow Agreement (collectively, the "Agreements") are unambiguous, and therefore summary judgment is the proper framework for enforcing their terms.  Here, as the relevant facts are undisputed, the

---

[115] *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 7, 2013) (quoting *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 1309398, at *3 (Del. Ch. May 1, 2007), *aff'd*, 957 A.2d 642 (Del. 2008) (TABLE)).

[116] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[117] *Kelly*, 2010 WL 629850, at *6 (footnote and internal quotation marks omitted) (quoting *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 n.3 (Del. Ch. 1987), and then quoting *Tunnell v. Stokley*, 2006 WL 452780, at *2 (Del. Ch. Feb. 15, 2006)).

[118] *Liggett Gp. Inc. v. Affiliated FM Ins. Co.*, 2001 WL 1456811, at *4 (Del. Super. Ct. Sept. 12, 2001) (collecting cases), *aff'd sub nom. Liggett Gp., Inc. v. Ace Prop. & Cas. Ins. Co.*, 798 A.2d 1024 (Del. 2002).

26

Court need only address three issues: (1) did Buyer comply with the Agreements' notice requirements to preserve its Indemnity Claim, and if not, did Buyer breach the Agreements by refusing to release the Indemnity Escrow Funds; (2) did Buyer breach Section 2.5 of the APA by failing to timely provide a Closing Statement, and if so, did Buyer breach the Agreements by refusing to release the Adjustment Escrow Funds; and (3) does Buyer's unclean hands defense preclude summary judgment in Plaintiffs' favor? I address each in turn, and conclude that the Motion is granted and denied in part as to Plaintiffs, and granted in part as to Defendant.

### A. Defendant, Not Plaintiffs, Is Entitled To Summary Judgment On Count I.

Plaintiffs claim that Defendant breached the APA by refusing to release the Indemnity Escrow Funds. Plaintiffs contend that Defendant did not timely notice its Indemnity Claim, such that the Indemnity Escrow funds were not "then claimed" under Section 2.8(c) and were required to be released "[p]romptly following the first anniversary of the Closing Date."[119] In response, Defendant argues that it did, in fact, properly notice its Indemnity Claim and "claim" the Indemnity Escrow Funds by February 7, 2020, and that in any event, Defendant substantially complied with the APA's terms.[120] I conclude that Defendant's notice was adequate under the

---

[119] APA § 2.8(c).

[120] *See* D.I. 24 at 32–34.

Agreements; that no dispute of material fact exists to that effect; and, therefore, that Defendant, not Plaintiffs, is entitled to summary judgment on Count I.

Defendant seeks indemnification for Plaintiffs' alleged breaches of the APA's Non-Fundamental Representations, which are subject to a one-year survival period after Closing.[121] The APA afforded Defendant recourse for those Non-Fundamental Representations to the extent any breach thereof occurred by and through February 7, 2020. The parties do not dispute that the alleged breaches of the Non-Fundamental Representations occurred before that date.

Rather, the dispute is over whether Defendant's notice to Plaintiffs was in the correct manner and timely.[122] Under Section 7.1 of the APA, "Survival," the expiration of the survival period has no effect where "a notice of claim has been submitted hereunder prior to such expiration."[123] Accordingly, the reader must look to Section 7.5(a), "Notice of Claim," to determine how Defendant was required to

---

[121] *See* APA § 7.1.

[122] Plaintiffs also argue that Defendant's Claim Notice is substantively deficient under the APA, contending it fails to allege breach of confidentiality covenants and fails to recite specific Losses attributable to breach of noncompete covenants. D.I. 18 at 29–31, 33–34. In addition, Plaintiffs argue that the proper remedy for a breach of the noncompete covenant is injunctive relief, not indemnification, under Section 5.7 of the APA. *Id.* at 33–34 (citing APA § 5.8(b)). These substantive arguments are misplaced on the Motion. Count I only asserts a claim for breach of the APA with respect to the Indemnity Escrow Funds, and does not reach the merits of any underlying Indemnity Claim. Plaintiffs will have ample opportunity to address these concerns in the context of Defendant's Counterclaim. *See, e.g.*, Countercl. ¶¶ 31–44, 74–76.

[123] APA § 7.1.

submit a notice of claim under Section 7.1.[124] That section specifies that Defendant was required to "give reasonably prompt written notice to" Plaintiffs, but that Defendant's indemnification right "shall not be adversely affected by a failure to give such notice unless, and then only to the extent that, an Indemnifying Party is actually and materially prejudiced thereby."[125]

Thus, to notice and preserve an Indemnity Claim for breach of Non-Fundamental Representations under the APA, notice must be "reasonably prompt" and "prior to" the expiration of the survival period, but late notice only adversely affects indemnification rights if and to the extent that the indemnifying party was actually and materially prejudiced.[126] That flexibility is by design. It reflects an agreement not to strip Defendant of an important protection based solely on a non-prejudicial delay in notice and is in keeping with the practicalities of Section 7.1's survival period.[127] Taken together, Sections 7.1 and 7.5(a) of the APA afford some temporal flexibility to Defendant when noticing and preserving Indemnity Claims.

---

[124] *See id.* §§ 7.1, 7.5.

[125] *Id.* § 7.5(a).

[126] *See id.* § 7.1 (noting that where a "notice of claim has been submitted hereunder prior to" expiration of the survival period, "such expiration shall have no effect"); *id.* § 7.5(a) (noting that a failure to give notice in accordance with the terms of the APA only affects indemnification if there is actual and material prejudice).

[127] An illustration is helpful. If Plaintiffs breached a Non-Fundamental Representation and Defendant learned of the breach in the survival period's final seconds, then Defendant would hold a viable, unexpired claim. Assume that to preserve that claim "prior to" the survival period's expiration under Section 7.1, Defendant submits reasonably prompt notice in a permitted manner at 11:59 p.m., before the survival period expires. But the

29

By contrast, Section 8.1, "Notice," provides formal and rigid manner requirements. For all notices under the APA to be "duly given," Buyer must send the notice to the addresses and in the manner specified.[128] Notice of an Indemnity Claim is "duly given" "(a) when delivered in person, (b) when received by facsimile, receipt confirmed electronically, (c) on the next Business Day when sent by overnight courier, or (d) on the second succeeding Business Day when sent by registered or certified mail (postage prepaid, return receipt requested), to the respective Parties at" the address specified under the APA.[129]

In addition to complying with the APA to preserve an Indemnity Claim, Buyer must comply with the Escrow Agreement's complementary requirements to seek escrow funds for that Indemnity Claim. As to time, Section 5 compels Buyer to give notice of the Indemnity Claim via a Claim Notice "prior to the expiration of the Escrow Period," or no later than February 10, 2020.[130] As to form, Section 16 of the Escrow Agreement contemplates electronic transmission other than facsimile, such as email, but requires the sender to "receive[] electronic evidence from the recipient

_____

consequences of time and space cause Plaintiffs to actually receive notice at or after 12:00 a.m., after the survival period expired. Or, alternatively, the consequences of time and space prevent Defendant from submitting notice until 12:01 a.m. or later, after the survival period expired. In either situation, Section 7.5's flexibility preserves Defendant's indemnification right, in the absence of actual and material prejudice to Plaintiffs.

[128] APA § 8.1.

[129] *Id.* § 8.1(a)–(d).

[130] Escrow Agreement § 5(a).

of the delivery."[131]  That Section also provides notice by courier service is "duly given and made" upon confirmation of delivery.[132]

On Friday, February 7, 2020, the last day to preserve a claim for breach of Non-Fundamental Representations, Defendant sent a Claim Notice via overnight express and via email to Plaintiffs' Specified Address.  Under the Escrow Agreement, that mailed notice was duly given on February 10, before the Escrow Period expired.[133]  Under the APA, Notice of the Indemnity Claim was "duly given" on the next Business Day after being sent by overnight courier:  Monday, February 10.[134]  While February 10 is not "prior to" the APA's survival period's expiration as facially required by Section 7.1, Defendant's Claim Notice was still valid by the grace of Section 7.5.  That Section dictates that Defendant's indemnification right is only foreclosed by a "failure to give such notice" under Section 7.1 "unless, and then only to the extent that, an Indemnifying Party is actually and materially prejudiced thereby."[135]  On the Motion, Plaintiffs have offered no evidence of actual, material

---

[131] *Id.* § 16(i).

[132] *Id.* § 16(iii).

[133] The parties do not dispute confirmation of the February 10 FedEx delivery and instead focus their dispute on the propriety of the February 7 email.  *See* Answer ¶ 50; D.I. 18 at 15–16, 23–24; D.I. 24 at 26; D.I. 27 at 13, 15 n.10.  In fact, Plaintiffs agree that the Claim Notice "was delivered by overnight courier in accordance with subsection (c) [of APA Section 8.1] and received on the next business day (February 10, 2020), so the notice was 'deemed to have been duly given' on February 10, 2020."  Compl. Ex. K at 3.

[134] APA § 8.1(c); *see also* Escrow Agreement § 16(iii).

[135] APA § 7.5(a).

31

prejudice, and at argument, Plaintiffs could not identify any prejudice aside from the alleged breaching untimely notice itself.[136]  In the absence of actual and material prejudice, Defendant's right to be indemnified for the reasons set forth in the Claim Notice is unaffected by the Claim Notice's timing.[137]

The Claim Notice by overnight courier was timely under both Agreements. By preserving its Indemnity Claim for Non-Fundamental Representations and submitting a Claim Notice for the entirety of the Indemnity Escrow Funds within these parameters,[138] Defendant rendered the Indemnity Escrow Funds "then claimed" for purposes of Section 2.8(c), such that Plaintiffs were not entitled to distribution of the Indemnity Escrow Funds "[p]romptly following the first

---

[136] *See, e.g.*, Hr'g Tr. at 12 ("But here, in particular, because the difference in strict compliance versus substantial compliance means this ultimately determines whether defendant's notice was timely or not and, therefore, whether sellers were entitled to disbursement or not, it really can't be said that there is a lack of prejudice.").

[137] In briefing, Plaintiffs sought summary judgment on the grounds that even proper notice could not preserve a claim for breach of a Non-Fundamental Representation beyond Section 7.1's survival period of twelve months after the closing date, and that the survival period served as a statute of limitations for filing an action for breach.  D.I. 18 at 25–29. Plaintiffs also contended that proper notice could only extend Buyer's time to file an action for breach for thirty days under Section 7.5(d)'s dispute resolution provision.  *Id.* at 28. But at argument, Plaintiffs agreed that a Claim Notice that satisfied the notice requirements would preserve the subject claim, and that the Indemnity Escrow Funds could remain in escrow and available pending adjudication of the claim beyond the survival period.  Hr'g Tr. 16–17.  I need not address this argument further.

[138] The Claim Notice asserted that Defendant's "damages exceed the amounts held in escrow."  Compl. Ex. J at 10.

anniversary of the Closing Date."[139]  Summary judgment on Count I is accordingly entered in Defendant's favor.

The Indemnity Escrow Funds were to remain in Escrow pending completion of the procedures in Section 7.5(d), which required the parties to consult in good faith and fail before initiating a lawsuit.[140]  Seller disputed the Indemnity Claim within ten days of receiving notice, as required by the APA, and after the parties could not resolve the dispute within thirty days, Defendant properly asserted its claims in this Court via its Counterclaim.[141]  The substantive issues underlying the Indemnity Claim have been raised via Defendant's Counterclaim.  Release of the Indemnity Escrow Funds is deferred pending a final judgment in this action.[142]  Upon adjudication of the Counterclaim, the Court will determine any "valid" claim to the Indemnity Escrow Funds, and thereafter payment, if any, shall be made in accordance with the APA from any validly "claimed" Indemnity Escrow Funds within thirty days.[143]

---

[139] APA § 2.8(c).  Assuming that the Claim Notice did not request payment of all Indemnity Escrow Funds, Seller would have been entitled to disbursal of any non-claimed portion under Section 2.8(c).

[140] *See id.* § 7.5(d); *see also id.* § 7.5 (b) & (c).

[141] *See* Compl. Exs. K & L; APA § 7.5(d).

[142] Any damages can be handled through an offset before entry of a final judgment in this matter.

[143] *See* APA §§ 2.8(c), 7.5(a)–(d).

### B. Plaintiffs Are Entitled To Summary Judgment On Count II.

I now turn to Plaintiffs' Motion on Count II, which seeks the Adjustment Escrow Funds on the grounds that Defendant's untimely Closing Statement breached the APA. The APA specifies rigid requirements for delivering the Closing Statement. Section 2.5(b) obligated Defendant to deliver the Closing Statement within ninety days of Closing, by May 8, 2019. Defendant's obligation to do so was mandatory and unconditional. There is no dispute—and in fact, Defendant concedes—that it did not deliver the Closing Statement by that date.[144] Defendant delivered the Closing Statement on July 3.

Defendant asserts Plaintiffs waived their right to a timely Closing Statement, and that Defendant needs discovery into Plaintiffs' performance under the APA to meaningfully assert an unclean hands defense against Count II, such that summary judgment is premature. As discussed below, Defendant's arguments regarding the Adjustment Escrow Funds fail. Summary judgment is granted in Plaintiffs' favor, as Defendant breached the APA and waived its right to a post-Closing adjustment. But the Adjustment Escrow Funds shall remain in escrow pending a final judgment.

---

[144] *See* Answer ¶ 28 ("Defendant admits that it did not deliver a Closing Statement by May 8, 2019.").

### 1. Plaintiffs Did Not Waive The Right To A Timely Closing Statement.

Defendant contends that Plaintiffs' June 24 Letter waived the Closing Statement deadline by demanding delivery of the Closing Statement by July 5. Defendant also asserts that "[t]o the extent Plaintiffs dispute the plain intention of that letter, this is a question of fact that precludes the entry of partial summary judgment (requiring, at a minimum, discovery regarding the drafting of the letter and any communications regarding the same)."[145]

Defendant's position is unsupported by Delaware law, the plain language of the APA and June 24 Letter, and Seller's conduct. "[U]nder Delaware law, a waiver is found where a party had actual or constructive notice of a known right, and that the party voluntarily and intentionally relinquished that known right."[146] It "implies knowledge of all material facts, and intent to waive."[147] "Waivers of contractual rights are not lightly found," as a waiver "must be unequivocal."[148] Further, under the APA, the parties agreed that "[a]ny failure or delay of a Party to comply with

---

[145] D.I. 50 at 1–2.

[146] *Ashall Homes Ltd. v. ROK Ent. Gp. Inc.*, 992 A.2d 1239, 1247 (Del. Ch. 2010) (alterations, footnote, and internal quotation marks omitted) (quoting *Danvir Corp. v. City of Wilm.*, 2008 WL 4560903, at *7 (Del. Ch. Oct. 6, 2008)).

[147] *James J. Gory Mech. Contr., Inc. v. BPG Residential P'rs V, LLC*, 2011 WL 6935279, at *3 (Del. Ch. Dec. 30, 2011) (quoting *Wimbledon Fund LP–Absolute Return Fund Series v. SV Special Situations Fund LP*, 2010 WL 2368637, at *4 (Del. Ch. June 14, 2010)).

[148] *Id.* (alteration omitted) (quoting *Wimbledon Fund LP–Absolute Return Fund Series*, 2010 WL 2368637, at *4).

any obligation herein may be waived only by a written instrument signed by the Party against whom the waiver is to be effective," and "[a]ny such waiver or failure to insist upon strict compliance with such obligation shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure."[149]

After the May 8 deadline to submit the Closing Statement passed, Plaintiffs informed Defendant that the deadline had lapsed.[150] After more time passed without Defendant submitting the Closing Statement, Plaintiffs again pointed out that the deadline lapsed and stated that Sellers would be forced to take legal action with respect to Defendant's failure to satisfy its obligations under Section 2.5 of the APA.[151] The June 24 Letter reiterated this position and, importantly, expressed Plaintiffs' belief that "SGI Genetics, Inc. [Buyer] is in default of, has breached and continues to breach and be in default of the Asset Purchase Agreement."[152] Plaintiffs indicated their willingness to move forward with Section 2.5's price adjustment process and afforded Defendant until July 5 to comply with the APA. But still, the June 24 Letter preserved Plaintiffs' position and claim that Defendant breached as of May 8.[153]

---

[149] APA § 8.5.

[150] *See* Compl. Exs. C, D, E.

[151] *See, e.g.*, Compl. Ex. E.

[152] Compl. Ex. F at 2.

[153] *See id.*

On this record, Plaintiffs did not waive the Closing Statement deadline, nor is there any genuine issue of material fact with respect to the same that precludes summary judgment. The parties negotiated for a strict express waiver provision, requiring written authorization by the opposing party to deviate from the APA's terms.[154] The June 24 Letter did not grant such an express waiver to Defendant, in view of its express assertion that Defendant had been and continued to be in breach of the APA.[155] Nothing in the June 24 Letter amounted to an unequivocal intention to waive Plaintiffs' claims. Because Defendant failed to deliver the Closing Statement by May 8 as required, Plaintiffs are entitled to a determination on the

---

[154] *See* APA § 8.5.

[155] Nor does Plaintiffs' good faith attempt to carry out Section 2.5's procedures, as required, excuse Defendant's noncompliance with its obligation to deliver the Closing Statement by May 8, 2019. *See* APA § 2.5(c) (mandating that the parties attempt to resolve price adjustment disputes in good faith); *id.* § 5.1(a) (stating that "the Parties will use their respective commercially reasonable efforts to take all action and to do all things necessary to consummate and make effective the transactions contemplated by this Agreement"). In the interactions following that deadline, Plaintiffs explained that Defendant's untimeliness violated the APA and reserved their right to file this exact claim. Defendant failed to follow Plaintiffs through Section 2.5's process in good faith, yet again upsetting the parties' agreed-to and carefully timed process. When the parties clearly could not resolve the Disagreements with respect to the untimely Closing Statement within twenty-five days, Plaintiffs asked in good faith that the parties submit Plaintiff's Disagreements with respect to the untimely Closing Statement to an independent accountant as required under Section 2.5(c). After being met with Defendant's persistent silence, Plaintiffs again asked in good faith to submit the Disagreement to an independent accountant, but warned that Defendant's failure to move forward would result in Court action. *See* Compl. Exs. H, I.

Motion that Defendant breached Section 2.5 of the APA and corresponding provisions of the Escrow Agreement.[156]

### 2. Defendant's Unclean Hands Defense Does Not Foreclose Summary Judgment.

Although agreeing that the APA is unambiguous and the relevant facts are undisputed, Defendant argues that genuine issues of material fact exist as to whether Plaintiffs materially breached the APA, and so Plaintiffs cannot enforce it against Defendant. Specifically, Defendant perceives such issues regarding whether certain information Schillinger shared with third parties is protectable confidential information under the APA; whether Plaintiffs made misrepresentations about value;

---

[156] Defendant also argues that the APA's requirement under Section 2.5(a) that Plaintiffs provide a "reasonable, good faith calculation of an estimate" of the accounts payable of the Company and its subsidiaries was a condition precedent to its obligation to deliver the Closing Statement under Section 2.5; that Plaintiffs failed to do so; and that, therefore, summary judgment should be denied. *See* D.I. 24 at 28–29. Vice Chancellor Laster addressed and rejected a similar argument, brought by an affiliate of Defendant here, in *J&J Produce Holdings, Inc. v. Benson Hill Fresh, LLC*, 2020 WL 1188052 (Del. Ch. Mar. 11, 2020) (ORDER), *appeal dismissed without prejudice*, 234 A.3d 161 (Del. 2020) (TABLE). There, the buyer argued that the seller breached the relevant agreement by not preparing an Estimated Closing Statement using reasonable, good faith estimates, and that therefore the buyer was absolved of its failure to timely submit a Closing Statement. *Id.* at *3. The Court rejected this position, reasoning that even if the buyer were correct in its assumptions, it failed to identify or explain the failures with regard to the estimates used to calculate the Estimated Closing Statement in a manner that would raise a material dispute of fact. *Id.* at *3–4. This logic applies with equal force here. The relevant provisions of the agreement in *J&J Produce* are very similar to those at issue in the APA. *Compare id.* at *3–4, *with* APA § 2.5. And while cast as failing to perform a condition precedent, Defendant has failed to explain how Plaintiffs' alleged failure to provide a reasonable, good faith calculation of an estimate of the accounts payable raises a material dispute of fact as to whether Defendant prepared its Estimated Closing Statement under Section 2.5(a) in good faith. Plaintiffs remain entitled to summary judgment on Count II.

whether Plaintiffs failed to disclose material contracts; and other problems. Although these potential shortcomings ultimately appeared in Defendant's Counterclaim, in opposing the Motion, Defendant categorizes them as unclean hands that would preclude Plaintiffs from seeking their requested relief.[157] And so in its Rule 56(f) affidavit, Defendant asserts that discovery is needed to develop that defense and that the issues bearing on that defense involve genuine disputes of material fact that preclude summary judgment.

"[A] party opposing summary judgment may, pursuant to Court of Chancery Rule 56(f), request limited discovery if it cannot present facts essential to oppose the summary judgment motion. Normally, Rule 56(f) comes into play when the party opposing summary judgment cannot state certain facts essential to justify its position because those facts are within the exclusive knowledge of the moving party."[158] The invoking party carries the burden under Rule 56(f) to show that it could not present facts essential to oppose the motion for summary judgment.[159] However, "[t]he Rule

---

[157] *See* Rue 56 Aff. ¶¶ 10, 12.

[158] *Corkscrew Mining Ventures, Ltd. v. Preferred Real Estate Invs., Inc.*, 2011 WL 704470, at *3 (Del. Ch. Feb. 28, 2011) (footnote omitted).

[159] *See, e.g.*, *K&K Screw Prod., L.L.C. v. Emerick Cap. Invs., Inc.*, 2011 WL 3505354, at *18 (Del. Ch. Aug. 9, 2011).

56 opportunity to present affidavits or engage in discovery is not absolute. It is necessarily circumscribed by the discretion of the trial court . . . ."[160]

The Court has permitted discovery pursuant to a Rule 56(f) affidavit where the party opposing summary judgment "claimed that several of its affirmative defenses required the support that discovery might yield."[161] But while purported need to conduct discovery into an affirmative defense may be sufficient to meet the invoking party's burden under Rule 56(f), the Court will not permit discovery where that party "ha[s] failed to identify any specific discovery that would inform the Court's consideration of their affirmative defenses."[162] More importantly, the Court has denied a request for discovery under Rule 56(f) where the evidence sought would be "irrelevant" in light of applicable law.[163]

---

[160] *Malpiede v. Townson*, 780 A.2d 1075, 1091 (Del. 2001); *see also Salzman v. Canaan Cap. P'rs*, 1996 WL 33167788, at *2 (Del. Ch. Apr. 19, 1996) ("A Rule 56(f) motion is designed to permit the Court, in the exercise of its discretion, to deny entry of judgment or withhold decision on a pending summary judgment motion to permit limited discovery, all with the expectation that limited discovery will clarify or eliminate disputed issues of fact.").

[161] *3Com Corp. v. Diamond II Hldgs., Inc.*, 2010 WL 2280734, at *1 (Del. Ch. May 31, 2010).

[162] *Quantlab Gp. GP, LLC v. Eames*, 2019 WL 1285037, at *7 (Del. Ch. Mar. 19, 2019), *aff'd*, 222 A.3d 580 (Del. 2019) (TABLE).

[163] *Salzman*, 1996 WL 33167790, at *1 (citing *A.I. Credit Corp. v. Liberty Mut. Ins. Co.*, 1996 WL 3962, at * (S.D.N.Y. Jan. 4, 1996) (denying Rule 56(f) application where the evidence sought to be obtained was irrelevant in light of the court's decision on dispositive issues)); *see also* Ch. Ct. R. 1 (stating the rules "shall be construed, administered, and employed by the Court and the parties, to secure the just speedy and inexpensive determination of every proceeding").

These principles are colored by Vice Chancellor Laster's holding in in *J&J Produce, Inc. v. Benson Hill Fresh, LLC*.[164] The buyer in that case was an affiliate of Buyer here, and was bound by an agreement with terms very similar to the APA's. There, as here, the buyer claimed that there were genuine issues of fact about whether the seller breached its obligations under the purchase agreement and "about whether the Seller's conduct rises to the level of reprehensibility to warrant the unclean hands bar on its claim."[165] The Court rejected this position and concluded that the buyer's unclean hands defense did not preclude summary judgment. "The purpose of the unclean hands doctrine is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims . . . ."[166] "The Court of Chancery has broad discretion in determining whether to apply the doctrine of unclean hands."[167] And in certain circumstances, an unclean hands defense will fail when applying it or allowing it to impede summary judgment would eschew well-settled principles of Delaware

---

[164] 2020 WL 1188052, at *4.

[165] *Id.* (alteration and internal quotation marks omitted).

[166] *Id.* (alterations omitted) (quoting *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976)).

[167] *Id.* (quoting *SmithKline Beecham Pharm. Co. v. Merck & Co.*, 766 A.2d 442, 448 (Del. 2000)).

contract law.[168]  In view of these principles and general principles of contract law,

Vice Chancellor Laster rejected the buyer's unclean hands defense:

> Although the Buyer frames its argument as an unclean hands defense, the Buyer essentially is asking this court to excuse its nonperformance because of the Seller's own breaches of the representations and warranties, which the Buyer characterizes as willful.  The Buyer, however, currently is seeking indemnification under the Agreement for those breaches.  A party may be excused from performance under a contract if the other party is in material breach thereof.  But a party may not refuse to perform its contractual obligations after a material breach while simultaneously retaining the benefits of a contract.  The Buyer therefore cannot seek indemnification under the contract while at the same time claiming that the Agreement was vitiated because of the Seller's material breach.  These well-settled principles of Delaware law foreclose the unclean hands defense.  Notably, this outcome does not leave the Buyer without a remedy.  It rather consigns the Buyer to the remedy it bargained for (indemnification), while denying the Buyer the self-help remedy that did not bargain for and yet invoked (frustration of the Adjustment mechanism).[169]

Here, Defendant has elected to pursue its Indemnity Claim with respect to the

same issues that underlie its unclean hands defense.  Defendant cannot pursue its

Indemnity Claim under the APA while simultaneously relying on Plaintiffs' alleged

breaches to excuse its own non-performance.  Rather, the proper course of action is

---

[168] *See id.*

[169] *Id.* (citations and internal quotation marks omitted) (quoting *Post Hldgs., Inc. v. NPE Seller Rep LLC*, 2018 WL 5429833, at *5 (Del. Ch. Oct. 29, 2018) (holding that a party's election to pursue indemnification required the party to "continue to be bound by and to perform under the contract as well")).

42

to permit both parties to pursue their respective breach allegations through the appropriate and contractually agreed-upon channels.

> ### 3. Defendant Has Waived Its Right To A Post-Closing Adjustment, But The Adjustment Escrow Funds Shall Remain In Escrow Pending A Final Judgment.

As a remedy for Defendant's breach, Plaintiffs seek a declaration that Defendant has waived its right to a post-Closing adjustment and immediate release of the Adjustment Escrow Funds. Vice Chancellor Laster also addressed this issue in *J&J Produce*.[170] In that case, the Court found the defendant buyer breached the governing agreement by failing to submit a Closing Statement.[171] When considering the appropriate remedy, the Court expressly rejected the buyer's contention that the Court should simply order the buyer to provide a Closing Statement and require the parties to complete the agreement's price adjust process, as "[t]hat result would reward the Buyer for its breach."[172] The Court determined that "[t]he more fitting contractual remedy is to deem the Buyer to have waived its right to the determination of the Final Adjustment Amount" because "[b]y failing to provide a Closing Statement, the Buyer prevented the Final Adjustment Amount from being determined in a timely fashion in accordance with the procedures set forth in the

---

[170] *Id.* at *2–3.

[171] *Id.* at *2.

[172] *Id.*

43

Agreement" and "thereby gave up its opportunity to have a Final Adjustment Amount that potentially came out in its favor."[173] And so under that agreement's post-closing adjustment process, which was nearly identical to Section 2.5 of the APA,[174] the Court determined that the buyer waived its right to post-closing price adjustment, that the Final Adjustment Amount was therefore deemed to be zero, and that the seller was entitled to any Adjustment Escrow Funds.[175]

This logic applies with equal force here, despite the fact that Defendant ultimately submitted a Closing Statement claiming to calculate a negative adjustment of $80,219.04. By submitting a Closing Statement too late, Defendant forfeited its right to a post-Closing adjustment and determination of the Final Adjustment Amount, and so the Final Adjustment Amount shall be deemed zero.[176] As in *J&J Produce*, to hold otherwise would reward Defendant for its breach—even more so here, where Defendant's Closing Statement seeks an adjustment in its

---

[173] *Id.*

[174] *Compare id.* at *2–3, *with* APA § 2.5(d)–(h).

[175] *See J&J Produce*, 2020 WL 1188052, at *2–3.

[176] *See id.* (explaining the basis for forfeiture and deeming the Final Adjustment Amount to be zero, "[w]ith apologies to mathematicians").

favor.[177]  Under the APA and principles of logic, Seller is entitled to the Adjustment Escrow Funds.[178]  Plaintiffs are entitled to a declaration to that effect.

This outcome fulfills the parties' expectations, which treated those funds as part of the baseline consideration for the deal.  The Adjustment Escrow Funds were placed in escrow as security for an Adjustment that benefitted Buyer; otherwise, they would go to Seller.  Because Buyer frustrated the determination of the Final Adjustment Amount by breaching its obligation to timely deliver the Closing Statement, the proper award of expectancy damages is to provide Seller with the baseline consideration to which the Seller was entitled; that amount is reflected by the Adjustment Escrow Funds.[179]

---

[177] *See id.*  From this reasoning, Defendant's argument that "Plaintiffs suffered no prejudice from any delay as they were and are able to review the Closing Statement and object to the calculations contained therein" is unpersuasive.  D.I. 24 at  26.  The parties agreed to the APA's temporal requirements for the Closing Statement.  They bargained for that ninety-day window with the expectation that they would know of their final financial positions under the APA shortly after Closing.  Defendant's tardiness breached Plaintiffs' bargained-for right, especially in the face of Plaintiffs' numerous communications alerting Defendant that the Closing Statement was overdue in violation of the APA.  Accordingly, the Court's determination is unchanged by Defendant's assertions that Defendant's untimely Closing Statement was substantively adequate.

[178] *See J&J Produce*, 2020 WL 1188052, at *2–3.  The APA contemplated a baseline outcome in which Seller received the Adjustment Escrow Funds as part of the transaction consideration.  APA § 2.5(e).  If the Final Adjustment amount is zero, or less than $50,000 in either direction, Seller would receive the Adjustment Escrow Funds.  *See id.* § 2.5(e), (f), (g), (h).

[179] *See J&J Produce*, 2020 WL 1188052, at *3.

45

In view of this determination, Plaintiffs request an order requiring specific performance and directing Defendant to immediately direct release the Indemnity Escrow Funds pursuant to Section 2.8(b).  This Court could issue such an order.[180] And the APA contemplates such an equitable remedy and prompt release of the Adjustment Escrow Funds following determination of the Final Adjustment Amount.[181]  "But the court is not obligated to issue a decree of specific performance, which remains a matter of discretion."[182]

*J&J Produce* is instructive yet again.  Vice Chancellor Laster concluded that, although the seller was entitled to the Adjustment Escrow Funds, "[e]ntering a decree of specific performance at this stage on the basis set forth in this order likely would trigger a series of unproductive procedural moves and countermoves."[183]  The same is true here.  As a matter of judicial economy, a series of potential and

---

[180] *See id.* at *5 (citing *QC Hldgs., Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *11 (Del. Ch. Aug. 28, 2018), and also citing *Sparton Corp. v. O'Neil*, 2018 WL 3025470, at *4 (Del. Ch. June 18, 2018)).

[181] *See* APA § 8.9(a) ("In the event that any party violates or fails or refuses to perform any covenant or agreement made by such party herein, the non-breaching party shall be entitled, in addition to the exercise of other remedies, to seek and (subject to court approval) obtain injunctive and other equitable relief . . . ."); *id.* § 2.5(e) (requiring release of the Adjustment Escrow Funds to Seller if the Final Adjustment Amount is deemed zero); *id.* § 2.5(h) (requiring prompt release of the Adjustment Escrow Funds to Seller within five days after determination of the Final Adjustment Amount); *id.* § 2.8(c) (requiring funds that are not "then claimed" by Buyer under Section 2.5 to be released to Seller within the later of ninety days after Closing or five days after determination of the Final Adjustment Amount).

[182] *J&J Produce*, 2020 WL 1188052, at *5 (citing *Kan. City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003)).

[183] *Id.*

46

disruptive appeals "can be avoided by denying the request for the decree and allowing the Adjustment Escrow Funds to remain in escrow until the end of the case."[184] That approach facilitates the speedy resolution of this matter, and considering the timeline of this dispute to date,

> [i]t seems unlikely that the Seller will suffer any harm from having the Adjustment Escrow Funds remain in escrow pending the entry of a final judgment. Under the arrangements for the Adjustment Escrow Funds, the Seller will earn interest in the interim. Because the Buyer's breach occurred on [May 8, 2019,] when it failed to deliver a timely Closing Statement, the Seller became entitled to the Adjustment Escrow Funds as of that date. The Seller's lost time value of money can be addressed through an interest award. Because the Adjustment Escrow Funds will earn some return in the interim, any interest award will take that amount into account.[185]

Plaintiffs' Motion is therefore granted with respect to Count II, and the Court will enter an order that Buyer breached its obligation to provide the Closing Statement, foreclosing the Buyer from obtaining a determination of the Final Adjustment Amount and entitling Seller to the Adjustment Escrow Funds. But release of the Adjustment Escrow Funds is deferred pending a final judgment in this matter.

## III.   CONCLUSION

For the foregoing reasons, summary judgment on Count I is GRANTED in Defendant's favor, and summary judgment on Count II is GRANTED in Plaintiffs'

---

[184] *Id.*

[185] *Id.*

favor.  The parties shall submit an implementing order within twenty days of this decision.