**SMITHKLINE BEECHAM PHARMACEUTICALS CO., Smithkline Beecham Holding Corporation, Smithkline Beecham Corporation and Smithkline Beecham Biologicals S.A., Defendants Below, Appellants,**

v.

**MERCK & CO., INC., Plaintiff Below, Appellee.**

No. 403, 1999.

Supreme Court of Delaware.

Submitted: June 20, 2000.
Decided: Dec. 1, 2000.

---

**20.** Mem. Op. at 58.

**21.** 676 A.2d at 445.

Richard K. Herrmann, Esquire, and Mary B. Matterer, Esquire, Blank, Rome, Comisky & McCauley, Esquire, LLP, Wilmington and Donald R. Dunner, Esquire, (argued), Susan H. Griffen, Esquire, Howard W. Levine, Esquire, John R. Alison, Esquire, and York M. Faulkner, Esquire, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP., Washington, D.C. and James K. Grasty, Esquire, and Yuriy P. Stercho, Esquire, SmithKline Beecham Corporation, Philadelphia, PA, for Appellants.

Richard D. Allen (argued), Mary B. Graham, Julia Heaney, and Bradley J. Enna, Morris, Nichols, Arsht & Tunnell, Wilmington and Paul D. Matukaitis and Kevin J. McGough, Merck & Co., Inc., Rahway, New Jersey, for Appellee.

Before WALSH, HOLLAND, JJ., and RIDGELY, President Judge.*

WALSH, Justice.

This is an appeal from a decision of the Court of Chancery following trial in an action between two pharmaceutical companies for misappropriation of trade secrets relating to a commercial process for producing chicken pox vaccine. The Court of Chancery determined that a misappropriation had occurred. The defendant argues on appeal that the Court of Chancery erred in its finding of misappropriation and in its application of the unclean hands doctrine and the statute of limitations. We find no error in the Court of Chancery's rulings and accordingly affirm.

## I

We draw upon the Court of Chancery's thorough post-trial decision for a recitation of the facts, most of which are not disputed. In 1970, Japanese scientist Dr. Michiaki Takahashi ("Dr. Takahashi") of the Research Institute for Microbial Diseases of Osaka University isolated a strain of the varicella, or chicken pox, virus known as the "Oka strain." Dr. Takahashi thereafter successfully developed a vaccine and published his initial results, prompting interest from a number of pharmaceutical companies, including SmithKline & French, the predecessor entity to the SmithKline Beecham Corporation (collectively "SmithKline"), and Merck & Co., Inc. ("Merck"). On June 1, 1975, SmithKline entered into an Option Agreement with Handai Biken ("Biken"), the commercial arm of the Research Institute at Osaka University. This agreement provided SmithKline the exclusive right to study and evaluate the Oka strain for a period of two years and gave SmithKline the option to receive an exclusive license for an Oka strain varicella vaccine in many territories throughout the world. The terms of the agreement required SmithKline to notify Biken at least three months prior to the expiration of the option period if SmithKline desired a license. The agreement terminated if SmithKline did not want a license or if a licensing agreement was not reached within six months after SmithKline notified Biken of its interest in acquiring a license.

---

* Designated pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rule 2.

The Option Agreement mandated that, "during the option period and during the term of any license agreement executed pursuant thereto," Biken could not disclose the Oka strain or information and data relating thereto, including any data, strains, or information provided by Smith-Kline, to any third party. Biken, however, was permitted to conduct testing, publish or release information for scientific and/or academic purposes, and to release some of the strain for purposes of obtaining patents. In addition, there was no limit imposed on Biken's ability to meet or negotiate with third parties who were interested in a license.

SmithKline encountered a variety of problems in its initial efforts to develop a vaccine.[1] As a result, the option period was extended through June 30, 1978,[2] and the period for concluding a licensing agreement was extended to September 30, 1978. When the final extension to the Option Agreement was executed, Smith-Kline gave the required three month notice to Biken regarding its desire to enter into a licensing agreement. The parties, however, failed to come to terms on a licensing agreement by September 30, 1978.[3] Rather than begin negotiations with another company, Biken continued to negotiate with SmithKline for more than a year. Due to SmithKline's failure to sign a licensing agreement and its inability to produce a vaccine, Biken formally terminated negotiations with SmithKline on December 20, 1979.

During the option period, and after its expiration, representatives from Merck had ongoing contact with Dr. Takahashi and others at Biken. At a July 11, 1976 meeting, Merck learned that Biken had entered into an option agreement with SmithKline. At this meeting, Dr. Takahashi passed along information about his work with the Oka strain as well as some published and unpublished papers.

On September 19, 1977, representatives from Merck visited Biken in Japan to determine if the SmithKline option agreement had expired. Merck learned that the agreement had been extended until March 1978, but was given an update on the status of Biken's continuing clinical trials with the Oka strain. On February 7, 1978, Merck representatives visited Biken "to reconfirm Merck's interest in evaluating the vaccine." At this meeting, Merck was given further information regarding clinical trials.

At a June 13, 1978 meeting—17 days before the end of the option period—Dr. Takahashi gave Merck: (i) a letter describing the clinical trial results of SmithKline's Oka strain varicella vaccine; (ii) general information regarding the results of SmithKline's research with the Oka strain; and (iii) additional information on the results of Biken's clinical trials. Dr. Takahashi subsequently met with representatives from Merck on four more occasions, providing various details concerning Biken and SmithKline's research progress before Biken finally terminated negotiations with SmithKline on December 20, 1979.

Biken immediately began discussions with Merck after terminating negotiations with SmithKline. In November 1980, Biken entered into a licensing agreement with Merck. Merck was given "Biken Know-How" and nonexclusive rights to use the Oka strain in the United States and Cana-

---

1. Production of the vaccine is difficult because the virus is highly sensitive. Therefore, a production process must take into consideration and account for a number of variables in order to be successful.

2. Upon the conclusion of the option period on June 30, 1978, the Court of Chancery determined that the parties' obligations of nondisclosure expired.

3. According to the terms of the original Option Agreement, a licensing agreement was to be finalized within three months of the expiration of the option period, or by September 30, 1978, a date that was not formally extended.

da. Through subsequent amendments, Merck's rights in the United States and Canada became exclusive, and Merck received nonexclusive rights elsewhere.

On February 18, 1982, SmithKline and Biken entered into a licensing agreement,[4] giving SmithKline non-exclusive rights to the Oka strain and Biken Know–How in Europe.[5] By 1985, SmithKline had developed a manufacturing process to produce varicella vaccine to meet the needs of smaller markets. SmithKline then began to develop a new process for producing the vaccine that would enable it to enter major commercial markets. SmithKline, however, experienced numerous difficulties in developing a satisfactory process and by 1990 had still not achieved much success.

In the fall of 1990, SmithKline, struggling with its new process, sought Biken's assistance. On December 6, 1990 researchers from Biken gave a detailed, step-by-step, presentation to individuals from SmithKline regarding Biken's process for producing varicella vaccine. The different steps of the production process were delineated and SmithKline was provided with slides of the Biken process. The Court of Chancery found that the information presented at this meeting was sufficient to show SmithKline the procedures[6] used by Biken. SmithKline conducted testing after the December 6 meet-

ing using Biken's procedures. Through the information it learned from Biken, SmithKline was able to increase quantity and achieve high potency which had been major obstacles to SmithKline's production success prior to meeting with Biken officials. This new procedure was drastically different from what SmithKline had been doing in the past. The Court of Chancery found that, after Biken's visit, the procedures adopted by SmithKline were exactly the same as Biken's and that SmithKline used Biken's presentation as a roadmap to a successful process.

In January 1991, SmithKline personnel visited Biken's production facility in Japan for five days. During this trip, SmithKline personnel were able to observe the Biken production process and received detailed information concerning those aspects of the process that could not be readily observed. Then, on January 3, 1991 SmithKline conducted a trial using Biken's procedures. The Court of Chancery concluded that "[SmithKline] used Biken Know–How in resolving its problems and finalizing its production process."

In July 1993, SmithKline released information pertaining to portions of its production process to the United States Food and Drug Administration in preparation of performing clinical trials in the United States.[7] Merck then filed suit in the Court of Chancery,[8] seeking to enjoin SmithKline

---

**4.** This agreement provided that the parties were required to keep confidential information relating to the strain and any other technical information furnished between the parties. The agreement allowed SmithKline to disclose information necessary to obtain government approval of a vaccine, but only within the contract territory.

**5.** The contract territory covered by this agreement was eventually expanded to include all the countries of the world except the United States, Canada, Japan, and Korea.

**6.** Because the specific nature of the procedures used by each company in their respective production processes implicate protectable trade secrets, the generic term "procedures" will be substituted.

**7.** Section 2.01 of the licensing agreement between SmithKline and Biken provided that SmithKline had the "non-exclusive right and license to use the Strain and Know–How to make, have made, use and sell the Vaccine in the Contract Territory," which included all the countries of the world except Japan, Korea, the United States and Canada. The Court of Chancery determined that performing clinical trials constituted a "use" contemplated by the language of the contract, which were to be limited to the contract territory. While other portions of the agreement provided SmithKline the right to disclose Biken Know–How to governmental authorities in order to obtain approvals, this right was limited to the contract territory.

**8.** Merck pursued these claims against SmithKline as Biken's licensee in the United States.

from marketing varicella vaccine in the United States and Canada, claiming that SmithKline misappropriated trade secrets. Following a trial, the Court of Chancery found that SmithKline had misappropriated trade secrets and enjoined SmithKline from marketing a varicella vaccine in the United States for three years after any such vaccine receives government approval.

## II

■ SmithKline first argues that the Court of Chancery erred by allowing Merck to assert SmithKline misappropriated trade secrets that were not defined at the beginning of the litigation or disclosed to SmithKline. This issue presents a question of law, which this Court reviews *de novo*. *See General Motors Corp. v. Wolhar*, Del.Supr., 686 A.2d 170, 172 (1996).

During discovery, SmithKline requested Merck to provide it with an identification of trade secrets ("ITS") before it would agree to disclose information concerning its production process. Merck complied and identified its claimed trade secrets as "the compilation and combination of information making up Biken's process," including the major process stages. The 37–page ITS described the Biken vaccine production process step-by-step and included the information Biken furnished SmithKline in 1990 and 1991. Seven months before trial, after taking discovery of SmithKline, Merck described in detail how SmithKline had used Biken Know–How in the development of SmithKline's production process. SmithKline asserts that Merck's original claim of misappropriation was only that SmithKline used the *entire* Biken process to manufacture varicella vaccine and that Merck had changed its claim after receiving information concerning SmithKline's production process, thus

prejudicing SmithKline. SmithKline refers to Merck's trial tactic as a "bait and switch" approach. The Court of Chancery, however, found that Merck did not limit its claim of misappropriation to use of the *entire* Biken process, and that SmithKline could not reasonably have believed otherwise. For this reason, the Chancellor refused to limit Merck's claimed trade secrets to only the *entire* Biken process.

■ We find that the Court of Chancery did not err by allowing Merck to refine the specifics of its claimed trade secret in light of the information it obtained from SmithKline. In cases involving trade secrets, the plaintiff is required to disclose, before obtaining discovery of confidential proprietary information of its adversary, the trade secrets it claims were misappropriated. *See Engelhard Corp. v. Savin Corp.*, Del. Ch., 505 A.2d 30, 33 (1986). The plaintiff must disclose the allegedly misappropriated trade secrets with reasonable particularity. *See Id.; Magnox v. Turner*, Del. Ch., C.A. No. 11951, 1991 WL 182450 at *1, Hartnett, V.C. (Sept. 10, 1991). This requirement is intended "to clarify the issues involved in the dispute so as to assure that there will be no disclosure of an adversary litigant's trade secrets beyond what is necessary for the prosecution of the litigation." *Engelhard*, 505 A.2d at 33; *accord Magnox*, 1991 WL 182450 at *1(stating that the purpose of requiring the plaintiff to disclose its trade secrets at the outset of the litigation "is to set the outer boundaries of discovery in order to avoid the needless exposure of a defendant's trade secrets"). Another rationale underlying this requirement is to ensure that defendants are put on notice of the claimed trade secrets early in the litigation, preventing defendants from being subject to unfair surprise on the eve of trial. *See Combined Metals of Chicago*

The Chancellor determined, prior to trial, that it was unnecessary to join Biken as a party to this litigation based on Biken's agreement to be bound by the judgment and to fully cooperate with discovery. Therefore, Merck was able to assert the claim of misappropriation against SmithKline and was subject to any defenses SmithKline had against Biken.

*Ltd. v. Airtek, Inc.*, N.D. Ill., 985 F.Supp. 827, 832 (1997).

In the present case, Merck's initial disclosure described its entire process as a protectable trade secret. Then, following discovery, it narrowed that broad trade secret claim to fit the particular aspects of the production process Merck claimed were misappropriated by SmithKline. SmithKline was initially put on notice through Merck's broad disclosure but was subsequently informed well in advance of trial of the specific aspects of the trade secret Merck believed SmithKline misappropriated. It cannot be said SmithKline was prejudiced in any way.

 SmithKline also contends the Court of Chancery erred in determining Biken's process Know–How constituted a trade secret and that such trade secret was misappropriated by SmithKline. Specifically, SmithKline argues that "Biken's lack of intent to maintain its procedure as a trade secret is clearly demonstrated by Biken's utter failure to prevent Merck from publishing this information in the Provost '736 patent." [9]

 The term trade secret encompasses a process that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and is [ ] the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 6 *Del. C.* § 2001(4). Whether the trade secrets were generally known or readily ascertainable and whether Merck took reasonable precautions to protect their secrecy is a question of fact. *See Injection Research Specialists, Inc. v. Polaris Indus., L.P.*, Fed. Cir., 168 F.3d 1320, 48 U.S.P.Q.2d 1719, 1726 (Aug. 13, 1998). Such a finding is reviewed for a determination of whether it is supported by substantial evidence, *see Collins v. Burke*, Del.Supr., 418 A.2d 999, 1004

(1980), and is not clearly erroneous. *See Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

SmithKline attempts to circumvent the Chancellor's findings that the Biken Know–How was not generally known or readily ascertainable by arguing that "Biken's decision to allow Merck to publish its [procedures] demonstrates a complete and utter failure to take reasonable efforts to maintain its secrecy." The Chancellor determined that the patent did not describe a commercial process, that it described procedures other than Biken's, and it did not indicate that the procedures were part of a commercial process. In addition, the Chancellor noted that SmithKline offered no testimony that one skilled in the area of vaccine production could reach any conclusions based on these disclosures. The record fully supports the Chancellor's determination that the Biken procedure was not generally known or readily ascertainable and was the subject of reasonable efforts to maintain its secrecy.

### III

 SmithKline next argues the Court of Chancery erred in its application of SmithKline's defense of unclean hands. Specifically, SmithKline contends the Chancellor: (i) impermissibly applied a balancing test to determine whether Merck's claims should be barred by unclean hands; (ii) relied on an efficient breach theory in balancing the parties' conduct; and (iii) incorrectly interpreted the terms of the option agreement. These contentions raise questions of law and are reviewed *de novo*. *See General Motors Corp. v. Wolhar*, Del.Supr., 686 A.2d 170, 172 (1996).

 The Court of Chancery has broad discretion in determining whether to apply the doctrine of unclean hands. *See Nakahara v. NS 1991 American Trust*, Del. Ch. 718 A.2d 518, 522 (1998)("the decisional authority is almost universal in its acceptance that courts of equity have extraordi-

---

**9.** The Chancellor found that Merck's patent did not publish Biken's procedures.

narily broad discretion in application of the doctrine [of unclean hands].”); *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245—46, 54 S.Ct. 146, 78 L.Ed. 293 (1933)(stating that “[courts of equity] are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion”); *see also* 27A Am.Jur.2d *Equity* § 126 (1996)(“The maxim is not one of absolutes and should be applied in the court's sound discretion.”).

We find that the Court of Chancery properly refused to invoke the doctrine of unclean hands as a bar to SmithKline's efforts for injunctive relief. The Court of Chancery did not, as SmithKline contends, apply a balancing test in rejecting its unclean hands defense. SmithKline's argument rests on a misreading of the opinion. While the language used was not precise, it is clear the Chancellor did not engage in a balancing of the parties' respective conduct through detailed analysis or lengthy discussion. Even though the court did draw a contrast to Merck's claims,[10] neither that statement nor the paragraph in which it appears purports to apply a balancing test to determine whether Merck had unclean hands. To the contrary, the court twice set forth the precise legal standard, first explaining that “when a party, who seeks relief in this Court 'has violated conscience or good faith or other equitable principles in his conduct, then the doors of the Court of Equity should be shut against him.' ” *E.J. Stephen, Inc. v. Ceccola*, Del. Ch., C.A. No. 7578, 1984 WL 8238, at *5, Berger, V.C. (July 9, 1984)(citing *Bodley v. Jones*, Del.Supr., 59 A.2d 463 (1947)). The court further elucidated the proper standard when it quoted from the United States Supreme Court's decision in *Precision Instrument*, stating: “It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.” *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). It is apparent that the Court of Chancery did not inappropriately apply a “balancing test” in determining the application of the unclean hands doctrine. Indeed, it appears the Court of Chancery was, as required by the case law, properly focusing on the plaintiff's conduct, just as SmithKline contends it should have done.

Furthermore, in rejecting SmithKline's unclean hands defense, the Court of Chancery did not, as SmithKline alleges, employ an “efficient breach” theory. The relevant part of the opinion states:

> Takahashi's disclosure amounts to a simple breach of contract. *Breach of contract alone does not necessarily require the application of the unclean hands doctrine.* Our courts have recognized, even if only by implication, that in appropriate circumstances breach of contract is justified and efficient. [citations omitted] Of course, there may be situations where, in the process of breaching a contract, a party acts so inequitably that the doctrine of unclean hands must apply. This is simply not the case.

*Merck & Co., Inc. v. SmithKline Beecham Pharm. Co.*, Del. Ch., C.A. No. 15443–NC, 1999 WL 669354, at *51, Chandler, C. (Aug. 5, 1999) (emphasis supplied).

Rather than applying an “efficient breach theory” as SmithKline claims, it is evident the Chancellor was merely citing the concept of “efficient breach” for the proposition that not all breaches necessarily amount to the imposition of the unclean hands doctrine. *Cf. Nakahara v. NS 1991 American Trust*, Del. Ch., 718 A.2d 518, 522 (1998)(noting that “Delaware courts have extraordinarily wide latitude to apply

---

**10.** The court stated: “unlike Merck's trade secret claims where there were discrete confidential pieces of information that [SmithKline] misappropriated, there is little or no persuasive evidence that the vast majority of information Merck received from Biken was... confidential.”

the unclean hands doctrine"). The disputed statement does not expressly nor by implication suggest that the court measured Merck's conduct under an efficient breach analysis.

██ SmithKline also challenges the Chancellor's finding that "Biken's breach of the Option Agreement was not so 'repugnant' as to warrant the application of the unclean hands doctrine." The Chancellor's determination is a question of fact and this Court's "review [is] limited to an inquiry as to whether the findings below support the conclusion that the plaintiff[ ] did not have unclean hands." *Collins v. Burke,* Del.Supr., 418 A.2d 999, 1004 (1980).

The Chancellor determined that Dr. Takahashi breached the confidentiality provision of the Option Agreement by providing Merck personnel with "detailed results of Biken's continuing clinical trials in Japan, unpublished papers, SB's clinical trial data, the yields obtained through SB's process, and other information regarding the Oka strain." The court found that much of this information "was either not confidential, was not detailed, or, even if confidential, was shortly released to the public domain." The court recognized that every breach of contract does not necessarily require the application of the unclean hands doctrine and that this particular breach was not "repugnant." Upon this basis the court concluded: "The question is whether Biken's breach of its non-disclosure obligation is so offensive that, as a matter of public policy, the Court should turn a deaf ear to the misappropriation of trade secrets claim. I find that Biken's breach of contract does not merit the application of the unclean hands doctrine." We find that this determination is adequately supported by the record below.

## IV

██ Finally, SmithKline contends that the Court of Chancery erred by not consistently applying the statute of limitations to Merck and SmithKline. The Court of Chancery concluded that Smith-Kline's counterclaims based on Biken's conduct in the late 1970's were barred by laches because the statute of limitations had run. SmithKline asserts the court failed to apply this standard to bar Merck's misappropriation claim based on the expiration of the statute of limitations. Whether the Court of Chancery applied the correct standard to SmtihKline's statute of limitations defense is a question of law which is reviewed *de novo. See General Motors Corp. v. Wolhar,* Del.Supr., 686 A.2d 170, 172 (1996). Factual findings bearing on the application of the statute are reviewed for clear error. *See Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972).

A claim for misappropriation of trade secrets "must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." 6 *Del. C.* § 2006. On the other hand, SmithKline's counterclaims against Merck were based on intentional interference with contract or prospective business relations, which are subject to a three-year statute of limitations. *See* 10 *Del. C.* § 8106. This statute, unlike that applying to Merck's misappropriation claim, is not a "discovery statute," and the limitations period begins to run from the time the cause of action accrues. *Id.* This is so "even if the plaintiff is ignorant of the cause of action." *In re Dean Witter Partnership Litig.,* C.A. No. 14816,, 1998 WL 442456 at *4, 1998 Del. Ch. Lexis 133 at *15, Chandler, C. (July 17, 1998). To prevent its claims from being barred, SmithKline had to demonstrate a basis for tolling the statute: that Biken fraudulently concealed the basis for its claims. *See e.g. Playtex, Inc. v. Columbia Cas.,* Del.Super., C.A. No. 88C–MR–233, 1993 WL 390469, 1993 Del.Super. Lexis 286 at *10, Del Pesco, J. (Sept. 20, 1993). The Court of Chancery found that while there may have been some acts of concealment committed by Biken, there was no evidence of fraudulent concealment presented. Therefore, there was no basis

for tolling the statute of limitations. We find that the Court of Chancery applied the appropriate statute of limitations to SmithKline's counterclaims and the record supports the court's finding that there was no basis for tolling the limitations period.

We conclude that the Court of Chancery's decision is fully supported by the record and free of any error of law and, accordingly, that decision is AFFIRMED.