EFiled: Jul 31 2025 02:25PM EDT
Transaction ID 76767931
Case No. Multi-Case

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE BREMERTON CELLULAR TELEPHONE COMPANY LITIGATION | ) ) | CONSOLIDATED C.A. No. 5949-VCL |
| IN RE SALEM CELLULAR TELEPHONE COMPANY LITIGATION | ) ) | CONSOLIDATED C.A. No. 6886-VCL |
| IN RE PROVO CELLULAR TELEPHONE COMPANY LITIGATION | ) ) | C.A. No. 6887-VCL |
| IN RE BLOOMINGTON CELLULAR TELEPHONE COMPANY LITIGATION | ) ) | C.A. No. 6888-VCL |
| IN RE SARASOTA CELLULAR TELEPHONE COMPANY LITIGATION | ) ) | C.A. No. 6889-VCL |
| IN RE BRADENTON CELLULAR TELEPHONE COMPANY LITIGATION | ) ) | C.A. No. 7030-VCL |
| IN RE LAS CRUCES CELLULAR TELEPHONE COMPANY LITIGATION | ) ) | C.A. No. 7031-VCL |
| IN RE ALTON CELLTELCO LITIGATION | ) ) | C.A. No. 7032-VCL |
| IN RE GALVESTON CELLULAR PARTNERSHIP LITIGATION | ) ) | C.A. No. 7033-VCL |
| IN RE BELLINGHAM CELLULAR PARTNERSHIP LITIGATION | ) ) | C.A. No. 7036-VCL |
| IN RE RENO CELLULAR TELEPHONE COMPANY LITIGATION | ) ) | C.A. No. 7042-VCL |

**MEMORANDUM OPINION**
**ADDRESSING MOTION FOR FINAL DISTRIBUTION**

Date Submitted: April 21, 2025
Date Decided: July 31, 2025

Carmella P. Keener, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Norman M. Monhait, REID COLLINS & TSAI LLP, Wilmington, Delaware; Michael A. Pullara, Houston, Texas; Allan B. Diamond, Justin Strother, DIAMOND MCCARTHY LLP, Houston, Texas; *Attorneys for Michael Pullara and Moving Plaintiffs.*

Mary S. Thomas, THOMAS LAW LLC, Wilmington, Delaware; *Attorneys for Darr Barshis and Ajamie LLP.*

**LASTER, V.C.**

Michael A. Pullara and Ajamie LLP litigated these cases together under a hybrid fee arrangement. They agreed to charge their clients 50% of their published rates and, if they obtained a recovery, split a contingency fee. Pullara would get a fixed 30% of the contingency fee and Ajamie a fixed 20%. They would split the other 50% in proportion to their lodestars. They documented the arrangement in a fee-sharing agreement.

By the time they secured a favorable settlement, Pullara and Ajamie were fighting over the fee. The parties placed the recovery in an escrow account. Pullara and Ajamie distributed the lion's share to the clients, made an initial distribution to themselves, and joined issue over the remaining $31,049,015.01.

Pullara had the primary client relationships, and he led the clients in contesting Ajamie's entitlement to a fee. Among other things, they argued that the fee-sharing agreement was unenforceable under the Texas Disciplinary Rules of Professional Conduct. The court agreed, invalidated the fee-sharing agreement, and awarded Ajamie a fee of $15,814,340.14 under principles of quantum meruit. If the fee-sharing agreement had been valid, Ajamie would have received more. After a distribution to Ajamie, $17,862,185.15 remained in the escrow account.

Pullara now claims he is entitled to $16,469,753.20. That would leave a balance of $1,392,431.95 in the account.[1] Pullara proposes for the balance to go to the clients. He maintains that the court's invalidation of the fee-sharing agreement means he is

---

[1] Neither amount includes interest. The escrow account bears interest, and Pullara and the clients are entitled to a proportionate share of the accrued interest when the escrow agent makes distributions to them.

entitled to those funds as well. Absent the ethical violation that rendered the fee-sharing agreement void, Ajamie would have received them. Pullara has disclaimed the increased amount, saying he does not want to profit from an ethical violation.

That is a laudable sentiment, but Pullara does not have any claim to those funds. Under principles of unclean hands, Pullara cannot benefit from the invalidation of the fee-sharing agreement. Pullara and Ajamie both committed the ethical violation that rendered the fee-sharing agreement invalid. If anything, because Pullara had the primary client relationship, Pullara was more responsible for the oversight. It would be inequitable for Pullara to benefit at the expense of his clients by getting more than he would have received if the unethical fee-sharing agreement remained in place. Pullara's show of generosity reflects only the outcome equity demands.

Pullara also offers an inflated calculation of his entitlement. If the fee-sharing agreement had been valid, Pullara would have received a total fee of $15,463,221.76. He cannot receive more than that.

Taking into account fees Pullara already received, Pullara is entitled to $14,167,344.02. The clients are entitled to $3,694,841.13. Both Pullara and the clients are entitled to interest on their share. The escrow agent must make the appropriate distributions.

## I.    FACTUAL BACKGROUND

The facts are drawn from the parties' submissions and the court's previous decision on Ajamie's fee.[2] As the court noted in that decision,

> The record contains a large number of exhibits, affidavits, declarations, and other documents that contain various calculations relating to how many hours each attorney worked, how much each attorney billed, what their lodestars would have been, when payments have been made and how much, and what the value of the services. Many of the documents are inconsistent or contain gaps. The court has spent considerable time deciphering the documents and striving to reach values that are as objectively correct as possible.[3]

That observation applies here too.

## A.    The Squeeze-Outs, Client Agreements, and Sharing Agreement

For historical reasons, AT&T, Inc. came to hold a majority interest in partnerships that owned cellular telecommunications licenses covering particular geographic areas. AT&T periodically engaged in freeze-out transactions that eliminated the minority investors in those partnerships.

Pullara is a Texas-licensed solo practitioner who had litigated successfully against AT&T during an initial round of freeze-outs. When AT&T engaged in a second round, many of the minority partners (the "Clients") signed agreements retaining Pullara as counsel (the "Client Agreements").

As a solo practitioner, Pullara needed help litigating against AT&T. To that end, each Client Agreement authorized Pullara to associate with joint venture

---

[2] *In re Bremerton Cellular Tel. Co. Litig.* (*Ajamie Fee Decision*), 328 A.3d 330 (Del. Ch. 2024).

[3] *Id.* at 337 n.16.

counsel. The Client Agreements committed Pullara and joint venture counsel to bill their hourly fees at 50% of their published rates. The attorneys also would be reimbursed for their expenses. As additional compensation, Pullara and joint venture counsel would receive a contingency fee equal to 20% of any recovery. Some of the Clients later signed amendments that raised the contingency fee percentage to 30% in exchange for eliminating their obligation to pay hourly fees. The Client Agreements made clear that adding joint venture counsel would not affect the size of the contingency fee.

The Client Agreements noted that Pullara intended to work with Ajamie. As foreshadowed, Pullara associated with Ajamie as joint venture counsel, and they agreed on how they would share any contingency fee (the "Sharing Agreement"). Texas law governed the Sharing Agreement.

Under the Sharing Agreement, Pullara would receive a fixed 30% of the contingency fee and Ajamie a fixed 20% (the "Fixed Tranches"). They would allocate the remaining 50% based on their relative contributions to the case, measured by their lodestars (the "Allocated Tranche").

B.    **Pullara and Ajamie Disagree About The Contingency Fee.**

Pullara and Ajamie had not planned to file in Delaware, but in 2009, AT&T filed preemptive declaratory judgment actions in this court. Litigating the resulting cases took a long time. In 2022, the court issued a post-trial decision in a bellwether case. In 2023, the Delaware Supreme Court affirmed. In 2024, the parties reached a global settlement keyed off the bellwether result. In the settlement, AT&T agreed to pay total consideration of $134,371,982.85. For purposes of the current motion, the

4

parties agree that the recovery generated a contingency fee of $29,606,757.66 (the "Contingency Fee").

As the cases neared conclusion, disagreements arose between Pullara and Ajamie. Pullara brought on Reid Collins & Tsai LLP as additional counsel. He told the clients that Reid Collins' fee would come out of his share of the Contingency Fee.

## C. The Charging Lien and the Initial Distributions

One of Pullara and Ajamie's disagreements concerned how to divide the Contingency Fee. Pullara had the principal relationship with the Clients, and they aligned themselves with Pullara. Acting at his behest, eighty-two of the eighty-three Clients terminated Ajamie's representation. One Client asserted that the Sharing Agreement was void.

To protect its claim, Ajamie moved for a charging lien against the settlement proceeds. The court approved the lien. The parties responded by placing all of the settlement consideration in escrow, then distributing $100,142,757.14 to the Clients. The parties also made initial distributions to Ajamie and Pullara. Those amounts principally covered expenses, but also some fees. Ajamie had incurred $1,210,853.12 in unreimbursed expenses and received a distribution of $2,038,586.36, meaning $827,833.24 went to unbilled fees.[4] Pullara had incurred $524,580.35 in

---

[4] Motion of Moving Plaintiffs and Michael Pullara for Final Distribution of Escrow Account, Ex. 2 (the "Master Allocation Spreadsheet"), sheet 1, cell C160 (identifying amount of Ajamie's unreimbursed expenses). Ajamie had already been reimbursed for $562,709.50 in expenses. *Id.*, sheet 1, cell C156.

unreimbursed expenses and received a distribution of $1,141,624.34, meaning $617,043.99 went to unbilled fees.[5]

After these distributions, $31,049,015.01 remained in the escrow account.

**D.     The Fee Dispute**

Pullara arranged for Diamond McCarthy LLP to represent the Clients in a lawsuit filed against Ajamie in Texas. Meanwhile, in Delaware, Ajamie moved for an order enforcing the charging lien and compelling the escrow agent to distribute an amount to Ajamie based on the Sharing Agreement. Pullara, Diamond McCarthy, and Reid Collins opposed the motion.[6]

In the *Ajamie Fee Decision*, the court held that Pullara and Ajamie failed to obtain informed client approval for the Sharing Agreement as required by the Texas Disciplinary Rules of Professional Conduct. The court found that the Sharing Agreement was void under Texas law.[7] That meant Ajamie could not enforce the Sharing Agreement to recover a share of the Contingency Fee. It did not mean, however, that Ajamie could not recover a fee, only that the court needed to determine reasonable compensation using principles of quantum meruit.

---

[5] *Id.* sheet 1, cell D160 (identifying amount of Pullara's unreimbursed expenses). Pullara had already received reimbursement for $19.028.75 in expenses. *Id.* sheet 1, cell D156.

[6] Cooch & Taylor LLP served as Delaware counsel. Its fees are not at issue.

[7] *Ajamie Fee Decision*, 328 A.3d at 345 ("The Sharing Agreement violates Texas Rule 1.04(f) and cannot be enforced against the Clients. Ajamie therefore cannot rely on the Sharing Agreement to recover its share of the Contingency Fee.").

During briefing, the Clients and Pullara asked the court to authorize a distribution of $14,695,201.64 from the escrow account to Pullara.[8] The court declined to address that issue as part of the dispute over Ajamie's fee.

The court awarded Ajamie a fee of $15,814,340.14. Ajamie had already received $2,799,618.27 in fees, so the escrow agent released $13,014,721.87 to Ajamie, plus interest of $172,108.08 earned on that amount.[9] That left a balance in the escrow account of $17,862,185.15.

E.      **The Current Motion**

Pullara and eighty-one of the eighty-three Clients (the "Moving Clients") now seek an order directing the escrow agent to disburse $16,469,753.20 to Pullara in full satisfaction of Pullara's claim to fees. Pullara and the Moving Clients ask to have the remaining $1,392,431.95 distributed to the Clients. Each distribution would include a proportionate amount of accrued interest.

According to the Pullara and the Moving Clients, the $1,392,431.95 represents incremental fees that Ajamie would have received if the Sharing Agreement had been valid. Pullara told the Clients that he became entitled to that amount under the Client Agreements once the court invalidated the Sharing Agreement, but he said he did not want to benefit from the ethical violation that rendered the Sharing Agreement void.

---

[8] Dkt. 149.

[9] *See* Master Allocation Spreadsheet, sheet 3, cell C9.

7

Before filing the motion, Pullara secured consent to his proposed distribution from the Moving Clients. One of the other two Clients failed to respond. The other—Darr Barshis—opposes the request. So does Ajamie. They argue that Pullara's fee, like Ajamie's fee, should be calculated based on quantum meruit. They contend that Pullara should receive $5,104,227.14 and the Clients should receive the rest.

## II.   LEGAL ANALYSIS

When lawyers breach the ethical obligations they owe their clients by entering into an unlawful fee-sharing arrangement, what should happen to amounts exceeding what one lawyer or the other would have received? For Ajamie, the court declined to enforce its claim to a share of the Contingency Fee and awarded a lesser fee under principles of quantum meruit.

Ajamie, however, was not the only wrongdoer. Both Ajamie and Pullara were responsible for the ethical violation that invalidated the Sharing Agreement.[10] If anything, because Pullara had the primary client relationship, he bore more responsibility.

What does that mean for Pullara's entitlement to the Contingency Fee, including Ajamie's excess share? According to Pullara, the *Ajamie Fee Decision* invalidated the Sharing Agreement but left the Client Agreements intact. Because he started out entitled to the entire Contingency Fee under the Client Agreements before agreeing to share it with Ajamie, Pullara thinks invalidating the Sharing Agreement

---

[10] *Ajamie Fee Decision*, 328 A.3d at 344 ("Ajamie and Pullara were both Texas lawyers and equally responsible for ensuring compliance with the Texas Rules.").

8

means the right to the full Contingency Fee reverts to him. Seeking to take the high road, Pullara told the Clients that he would disclaim the increased amount he would have received—i.e., the incremental amount Ajamie would have received—which Pullara pegs at $1,392,431.95.

Pullara has the general concept right, but not the doctrine. Pullara did not have the choice to disclaim any incremental amount he might receive due to the unethical Sharing Agreement. Unclean hands bars him from receiving any benefit that resulted from violating his ethical duties to the Clients. He had no entitlement to an incremental amount over what he would have received if the Sharing Agreement remained in place. Any additional fee that otherwise would have gone to Ajamie must go to the Clients, not to Pullara.

Public policy plays an essential role when a court of equity applies the unclean hand doctrine. "Ultimately, the doctrine is about public policy, and the Court has the broad discretion to refuse relief if [a party] can establish that [the other party] does not meet a very basic though inexact standard: 'where the litigant's own acts offend the very sense of equity to which he appeals.'"[11] Permitting Pullara to keep the entire Contingency Fee once the court invalidated the Sharing Agreement would be bad policy. It would give attorneys like Pullara with the primary client relationship an incentive not to share all of the information that the ethical rules require, because

---

[11] *Merck & Co. v. SmithKline Beecham Pharm. Co.*, 1999 WL 669354, at *45 (Del. Ch. Aug. 5, 1999) (quoting *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998)), *aff'd*, 766 A.2d 442 (Del. 2000); *see Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 484–85 (Del. Ch. 2022).

9

they could benefit from the invalidation of the sharing agreement. That in turn would complicate the negotiation and implementation of sharing agreements, because the firm without the primary client relationship would have to engage in greater efforts to protect itself against that possibility. Ensuring that an attorney cannot benefit from failing to provide the necessary disclosures avoids that risk.

To be clear, this court has not concluded that either Pullara or Ajamie intentionally violated the Texas Disciplinary Rules of Professional Conduct by withholding information from the Clients. People (including attorneys) make mistakes. Here, failing to provide the ethically required information rendered the Sharing Agreement invalid. Preventing an attorney in Pullara's position from benefiting from that outcome promotes compliance with the ethical rules.

Pullara also gets the numbers wrong. He argues that the Clients should receive $1,392,431.95. In fact, they are entitled to $3,694,841.13.

## A.    Calculating Pullara's Fee

Pullara cannot now receive more than he would have received if the Sharing Agreement had been valid. That amount varies depending on how to split the Allocated Tranche, which turns on the relative values of Pullara and Ajamie's lodestars. The relative values vary based on whether Pullara can include amounts for other lawyers in his lodestar. If he can, his lodestar increases and his amount of the Allocated Tranche increases, so his total fee increases.[12]

---

[12] The relative value of Ajamie's and Pullara's time for the Allocated Tranche is a ratio, so it is not mathematically necessary to incorporate the 50% discount that Pullara and Ajamie agreed to give the Clients. That, however, is how Pullara

10

The Sharing Agreement, although invalid, sheds light on the extent to which Pullara could include other professionals' work in his lodestar. It states:

> The time value of work performed by any attorney or paralegal employed by Pullara shall be attributable to Pullara. The time value of work performed by any attorney or paralegal employed by Ajamie shall be attributable to Ajamie. The final 50% of the gross contingent fee shall be divided between Pullara and Ajamie based on the ratio of the time value of all Pullara work on the case to the time value of all Ajamie work on the case.[13]

Put simply, if Pullara employed attorneys or paralegals, he could claim the value of their time when calculating his share of the Allocated Tranche.

There are four sources of time at issue in Pullara's lodestar calculation.[14] Pullara properly included time attributable to David Siegel valued at $103,320. Pullara also properly included time attributable to Leonard Roth valued at $3,324.

Pullara improperly included time attributable to Diamond McCarthy valued at $98,031.06. Pullara and the Clients did not hire Diamond McCarthy to litigate the action against AT&T, and Diamond McCarthy did not help secure the recovery that gave rise to the Contingency Fee. Pullara and the Clients hired Diamond McCarthy to litigate the fee dispute with Ajamie, which was not part of the Sharing Agreement.

---

performed his calculations. *See* Master Allocation Spreadsheet, sheet 1, cells F156–N156. This decision follows that convention. Unless otherwise stated, for purpose of the Allocated Tranche calculation, the value of all attorney time reflects a 50% discount.

[13] Sharing Agreement, Dkt. 131 Ex. B ¶ 3.

[14] Master Allocation Spreadsheet, sheet 1, cell G169.

Pullara also improperly included $1 million attributable to Reid Collins. Pullara hired Reid Collins towards the end of the settlement process, and Reid Collins doubtless incurred some time litigating against AT&T that could have been included in Pullara' lodestar. But rather than including those amounts, Pullara included a flat fee of $1 million for Reid Collins. The Sharing Agreement called for a lodestar calculation; it did not contemplate flat fees. Moreover, at least some of that fee appears attributable to Reid Collins assisting Pullara in the fee dispute with Ajamie and an earlier fee dispute with Pricket Jones & Elliott LLP. Pullara should not have included the $1 million.

Based on these rulings, Pullara could claim a total lodestar of $2,553,257.75. Pullara himself billed time valued at $678,833.75 and had unbilled time valued at $1,813,680. The court agrees with Ajamie that at least 120 hours of Pullara's time related to the fee dispute with Ajamie and should not be included. Ajamie pegs the undiscounted value of these hours at $91,800. After incorporating the 50% discount, that results in a deduction of $45,900. Adding $103,320 for Siegel's time and $3,324 for Roth's time generates a total lodestar of $2,553,257.75.

In the *Ajamie Fee Decision*, the court valued Ajamie's undiscounted lodestar at $13,178,616.78.[15] Discounting that amount by 50% yields $6,589,308.39. Together, Ajamie and Pullara had an aggregate lodestar of $9,142,566.14, with Pullara

---

[15] *Ajamie Fee Decision*, 328 A.3d at 348. When determining Ajamie's lodestar, the court accounted for increases in Ajamie's published rates. Pullara has not sought a similar adjustment, nor did he provide the information necessary to make it. Any claim Pullara might have to an increased lodestar is waived.

responsible for 27.93%. Pullara was therefore entitled to 27.93% of the Allocated Tranche, or $4,134,583.71.[16]

In terms of his total fee if the Sharing Agreement were valid, Pullara would also have been entitled to his unbilled fees valued at 50% (excluding the hours spent on fee dispute with Ajamie), resulting in another $1,767,780.00,[17] plus his invoiced fees valued at 50% for another $678,833.75,[18] plus another 30% of the Contingency Fee from the Fixed Tranches for $8,882,024.30. Adding those amounts to Pullara's share of the Allocated Tranche brings his total entitlement to $15,463,221.76.

Pullara has received fees of $1,295,877.74: $678,833.75 from the Clients and $617,043.99 from the initial distribution.[19] He is therefore entitled to another $14,167,344.02 from the escrow account. For Pullara to receive any more would be an improper windfall. Having participated in the ethical violation that invalidated the Sharing Agreement, Pullara cannot receive more.

The escrow account currently contains $17,862,185.15, plus accrued interest. The Clients are entitled to $3,694,841.13, representing the difference between the $17,862,185.15 remaining and the $14,167,344.02 to which Pullara is entitled. The Clients and Pullara are each entitled to a proportionate share of the interest.

---

[16] Ajamie would have been entitled to 72.07% of the Allocated Tranche, or $10,668,795,12.

[17] $1,813,680 − $45,900 = $1,767,780.00. *See* Master Allocation Spreadsheet, sheet 1, cell J156.

[18] *Id.* sheet 1, cell I156.

[19] *See id.* sheet 1, cells I156–J156; Part I.C, *supra*.

**B.      The Ineffectiveness Of The Client Consents**

Pullara sought to establish his claim to his requested distribution by securing approval from the Moving Clients. The client approvals are ineffective because Pullara did not provide the Moving Clients with full and accurate disclosure.

An attorney is an agent. "Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person."[20] When an agent has interests adverse to the principal as to matters within the scope of the agency, then the agent "has a duty to deal fairly with the principal and to disclose to him all facts which the agent knows or should know would reasonably affect the principal's judgment, unless the principal has manifested that he knows such facts or that he does not care to know them."[21] "[T]o the extent that the agent has a duty to the principal to have or to acquire relevant information concerning the subject matter of the agency, he is not privileged to deal with the principal unless he discloses the information which he thus would have if he had been competent and attentive to his duties as agent, unless he reveals, or the principal otherwise knows of, his ignorance."[22] A lawyer's specific duties include an obligation

---

[20] Restatement (Second) of Agency § 381 (A.L.I. 1958).

[21] *Id.* § 390.

[22] *Id.* cmt. b.

to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."[23]

Pullara sent an email asking the Clients to approve his proposed distribution.[24] To his credit, the email provided a lot of information, but Pullara fell short of his disclosure obligations. Pullara told the Clients that he was entitled to the entire Contingency Fee once the court invalidated the Sharing Agreement, but that was contestable at best. Pullara also told the Clients that Ajamie's quantum meruit fee was approximately $1.5 million less than what Ajamie would have received under the Sharing Agreement, but that calculation was also contestable. As this decision has determined, both statements were inaccurate. More generally, Pullara gave the Clients his side of the story. He did not give them a balanced account.

Here too, the court has not concluded that Pullara intentionally withheld information or misled his clients. Pullara likely believed in good faith that his disclosures were sufficient. They were not. Accordingly, the approvals Pullara received from the Clients do not justify his proposed distribution.

## III. CONCLUSION

The escrow agent must distribute $14,167,344.02 to Pullara and $3,694,841.13 to the Clients, plus a proportionate share of the accrued interest. Within thirty days, Delaware counsel must submit a form of order implementing this decision. The court intends for that order to be its final act in these long-running cases.

---

[23] Restatement (Third) of the Law Governing Lawyers § 20(3) (A.L.I. 2000).

[24] *See* Dkt. 163 Ex. 7.

15

## Multi-Case Filing Detail: The document above has been filed and/or served into multiple cases, see the details below including the case number and name.

## Transaction Details

**Court:** DE Court of Chancery Civil Action

**Transaction ID:** 76767931

**Submitted Date & Time:** Jul 31 2025 2:25PM

**Document Type:** Memorandum Opinion

**Document Title:** MEMORANDUM OPINION ADDRESSING MOTION FOR FINAL DISTRIBUTION

## Case Details

| Case Number | Case Name |
| --- | --- |
| 5949-VCL | CLOSED (11/18/2022) CONF ORD-CONS W/6885-VCL IN RE BREMERTON CELLULAR TELEPHONE COMPANY LITIGATION |
| 6887-VCL | CLOSED (4/4/2024) CONF ORD ON DISC - IN RE PROVO CELLULAR TELEPHONE LITIGATION COMPANY |
| 6888-VCL | CLOSED (4/17/2024) CONF ORD ON DISC - IN RE BLOOMINGTON CELLULAR TELEPHONE COMPANY LITIGATION |
| 6889-VCL | CLOSED (4/4/2024) CONF ORD ON DISC - IN RE SARASOTA CELLULAR TELEPHONE COMPANY LITIGATION |
| 7030-VCL | CLOSED (4/17/2024) CONF ORDER IN RE BRADENTON CELLULAR TELEPHONE COMPANY LITIGATION |
| 7031-VCL | CLOSED (4/4/2024) CONF ORDER IN RE LAS CRUCES CELLULAR TELEPHONE COMPANY LITIGATION |
| 7032-VCL | CONF ORD ON DISC - IN RE ALTON CELLTELCO LITIGATION |
| 7033-VCL | CONF ORDER IN RE GALVESTON CELLULAR PARTNERSHIP LITIGATION |

| Case Number | Case Name |
| --- | --- |
| 7036-VCL | CLOSED (4/17/2024) CONF ORDER IN RE BELLINGHAM CELLULAR PARTNERSHIP LITIGATION |
| 7042-VCL | CLOSED (4/4/2024) CONF ORD ON DISC - IN RE RENO CELLULAR TELEPHONE COMPANY LITIGATION |